Elmer BRITTON and Janet Kochanowski, individually and in behalf of all other similarly situated permanent public schoolteachers employed by South Bend Community School Corporation, Jeanne Renbarger, Plaintiffs,

v.

SOUTH BEND COMMUNITY SCHOOL CORPORATION, Defendants.

Julia ANDREWS, John W. Berta, Rosemarie Bradford, Anita Golba, Barbara Gottlick, Helen Keller, Cleora Kelsch, Sandra J. Koch Bolka, Janet L. Kochanowski, Kenneth Marosz, Margaret McAllister, Linda Newcomer, Mary Pajakowski, John Panos, Sue Paulin, Gordon Polsgrove, Kathleen Renz, Dora L. Riddle, Perry B. Scott, Lynne D. Sill, Dale L. Strombeck, Judith E. Taelman, Joan Tetzlaff, Kathy Troester, John P. Wibbens, Alan S. Bell, Wallace Boocher, Kathryn A. Britton, Larry L. Edler, J.A. Garretson, Sue Hill, Bonita Hoover, Edward J. Linetty, Jean Meiss, Richard B. Rajter, Richard Tomaszewski, Patricia A. Toth, Terry Tulchinsky, Bonita Ujdak, Elmer Britton and Jeanne Renbarger, Plaintiffs,

v.

SOUTH BEND COMMUNITY SCHOOL CORPORATION, Hollis E. Hughes, Jr., William L. Wilson, Loretta Jacobson, Oscar T. Brookins, Anthony V. Luber, Eileen T. Bender, and Donald W. Yates, acting in their official capacity as members of the South Bend Community School Corporation Board of Trustees, Defendants.

Nos. S 82–283, S 82–485.

United States District Court,
N.D. Indiana,
South Bend Division.

Sept. 25, 1984.

Donald E. Wertheimer, Daniel H. Pfeifer, South Bend, Ind., for plaintiffs.

Franklin A. Morse II, David R. Melton, Robert J. Smith, Jr., South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This action arises under the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. §§ 1981, 1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Indiana Constitution and the Indiana Teacher Tenure Act, I.C. 20–6.1–4–1, *et seq.* Jurisdiction of this court is predicated upon a federal rights question under 28 U.S.C. § 1331, civil rights claims under 28 U.S.C. § 1343 and an employment discrimination (Title VII) claim under 42 U.S.C. § 2000e–

5(f)(3). Jurisdiction over the state claims is grounded on a theory of pendent claim jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This case was tried before the court sitting without a jury on April 26–27, 1984. Post-trial briefs and proposed findings of fact and conclusions of law were submitted to the court by all parties on July 30, 1984. Final argument was held in South Bend, Indiana, on August 3, 1984. This memorandum and order constitutes this court's findings of fact and conclusions of law for purposes of F.R. Civ.P. 52(a).

## I.

This dispute has its genesis in the voluntary adoption by the South Bend Community School Corporation Board of Trustees (Board) of an affirmative action plan (Resolution 1020) designed to increase the percentage of minorities in the teaching force. The plaintiffs are white teachers who were laid off by the South Bend Community School Corporation (School Corporation) on June 7, 1982. Resolution 1020 was adopted on December 18, 1978 after several discussions at Board meetings focusing on the recruiting and hiring practices of the School Corporation and the low percentage of minorities on the School Corporation's teaching staff. Over the course of these discussions, statistics were presented to the Board exhibiting the disparity between the percentage of blacks in the student body.

One such presentation was made on October 7, 1978 by Mr. William Roberts, acting Assistant of Superintendent of Personnel. He introduced statistics showing the number of black teachers and the number of black employees from 1970–1978. Statistics were also presented showing the number of black teachers in each school in 1970 and 1978 and the number of blacks who had left the School Corporation since 1975. Mr. Willie Green, a black community activist, presented other statistics comparing the percentage of black students with the percentage of black staff members.

Resolution 1020, as finally adopted, provides that the School Corporation will strive to increase the percentage of minorities in its teaching force until that percentage equals the percentage of minorities in its student body. The Board specifically resolved to increase the percentage of minority pupils because it deemed it essential that the student population, both black and white, have a sufficient number of minority teachers to act as role models.

During the next three school years, (1978–79, 1979–80 and 1980–81), the School Corporation hired a greater percentage of black teachers then it had hired in any prior three-year period since records have been kept regarding the racial composition of the teaching force. From the 1978–79 school year to the 1981–82 school year, 63 out of the 161 teachers hired were black. The percentage of black teachers in the teaching force increased from 10.4% in the 1978–79 school year to 13% in the 1981–82 school year. The percentage of black pupils in the School Corporation in the 1981–82 school year was 25.42%.

On February 8, 1980, Resolution 1020 was incorporated into the Consent Order entered by this court in *United States of America v. South Bend Community School Corporation, et al.,* Cause No. S 80–35.[1] The United States Department of

---

1. The United States filed a suit in February 1980 against the South Bend Community School Corporation, its Superintendent, its Board of Trustees, individually and as a group, alleging that defendants had engaged in various acts of discrimination with the intent and effect of segregating students and faculty on the basis of race in the South Bend, Indiana public school system. The suit was brought under Section 407 of Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6) and Section 207 of the Equal Educational Opportunities Act of 1974 (20 U.S.C.

§ 1706). The Government sought an injunction prohibiting defendants from discriminating on the basis of race or color in operating the schools within the territory of the School Corporation and requiring defendants to develop and implement a desegregation plan which should remove all vestiges of prior discrimination.

This court entered a consent order submitted by the parties and calling for defendants to develop and implement a desegregation plan for student assignments by the beginning of the 1981–82 school year on February 8, 1980. On

Justice had commenced that action earlier on the same day. In its complaint, the Justice Department alleged that the School Corporation had engaged in acts of discrimination which were intended to segregate, and had the effect of segregating, students and faculty on the basis of race within the school system.

The Consent Order required the School Corporation to formulate a specific desegregation plan for student assignment by September 1, 1980. In addition, the Order required the School Corporation to continue to pursue its present affirmative action hiring policies. Further the Consent Order contained the School Corporation's denial that it ever engaged in intentional discrimination. At no time were findings made that the School Corporation had engaged in intentional discrimination against any black applicant or teacher.

On May 16, 1980, the School Corporation entered into a three-year Collective Bargaining Agreement with the NEA-South Bend, the exclusive bargaining representative for the School Corporation's teachers. The Agreement, in Article XXIII, § 9, provides that in the event of a reduction in force, "No minority bargaining unit employee shall be laid off." The term "minority" referred only to black teachers. The provision had not appeared in any prior collective bargaining agreements between the School Corporation and the NEA-South Bend.

Prior to and during the negotiations, the administration and the Board anticipated that the Board might have to lay off teachers during the term of the 1980–83 Collective Bargaining Agreement. Thus, the School Corporation negotiating team proposed the "no minority lay-off" clause to maintain the success it had achieved in recruiting minority teachers pursuant to Resolution 1020.

The negotiations which led to the 1980–83 Collective Bargaining Agreement lasted two weeks. After the negotiations, representatives from the NEA-South Bend met with the teachers to discuss the proposed Collective Bargaining Agreement. Article XXIII, § 9 was discussed at that meeting. Thereafter, the teachers ratified the proposed agreement by a substantial margin. No member of the Union ever filed a grievance alleging that he or she was not fairly represented by the NEA in the negotiations leading to the 1980–83 Collective Bargaining Agreement.

On April 26, 1982, the Board determined by resolution to eliminate 232 teaching positions, necessitating an actual reduction in

February 26–27, 1981, the Board of School Trustees passed a resolution adopting a desegregation plan for student assignments. On February 27, 1981, the parties to the suit submitted to this court a proposed consent order incorporating the plan. The plan was subsequently revised, resubmitted to the district court on April 3, 1981, and was adopted by this court on April 17, 1981.

On February 26, 1981 Clay Quality Education II, Inc. (Clay) sought leave to intervene as a defendant. Clay was an Indiana not-for-profit corporation whose members were parents of children in the South Bend school system. On March 3, 1981 the South Bend Branch of the National Association for the Advancement of Colored People (NAACP) also filed a motion to intervene. On April 17, 1981, this court entered an order denying the NAACP's and Clay's motions to intervene. A timely notice of appeal was filed by Clay with respect to the order refusing intervention. See U.S. v. South Bend Community School Corporation, 511 F.Supp. 1352 (N.D.Ind.1981).

On May 4, 1981, the NAACP filed a motion for reconsideration of the April 17 order refusing intervention. Clay filed a notice of appeal from that order on May 13, 1981. On May 27, 1981, this court stayed the implementation of the April 17 consent decree pending appeal. The School Corporation and the Justice Department each filed motions to vacate the stay order on May 28 and 29, 1981, respectively. The NAACP motion for reconsideration, as well as the motions of the School Corporation and the Justice Department for vacation of the stay, were denied by this court on June 1, 1981. Thereafter, the School Corporation and the Justice Department filed motions in the Court of Appeals for the Seventh Circuit requesting that court to vacate the stay pending appeal. That court did so on August 5, 1981. The Court of Appeals subsequently affirmed this court's denial of the motions to intervene on July 28, 1982. On motion of the defendants, the Court of Appeals affirmed the order in a published order. See United States v. South Bend Community School Corp., 692 F.2d 623 (7th Cir.1982).

force of 188 teachers.[2] The Administration promptly notified the 188 teachers, including the plaintiffs, that their contracts were being considered for cancellation as is required by I.C. § 20–6.1–4–11. After receiving this notice, certain teachers pursuant to I.C. 20–6.1–1–1 *et seq.*, filed written requests for a statement of why the Board was considering their contracts for cancellation. In compliance with such requests, the Board advised those persons that their contracts were being considered for cancellation because of an alleged justifiable decrease in the number of teaching positions resulting from declining pupil enrollment and increased operating expense. Certain teachers also requested a hearing pursuant to I.C. § 20–6.1–4–11, on the proposed reduction in force and the cancellation of their contracts.

The Board scheduled the hearing for May 24, 1982. On the day of the hearing, counsel for several of the teachers asked for, and received, a continuance to better prepare for the hearing. The Board rescheduled the hearing for June 1, 1982 at 4:00 o'clock P.M. Counsel for the teachers did not object to the appointed time of the hearing nor did they seek any other continuance throughout the course of the proceeding. The hearing, which was open to the public, began at 4:00 o'clock P.M. and lasted until 6:00 o'clock A.M. on June 2, 1982. The entire Board presided at the hearing with Mr. Hollis Hughes, president of the Board, acting as chief hearing officer.

The rescheduled hearing was conducted along guidelines adopted from materials obtained from the Indiana State School Board Association and supplemented by the advice of counsel for the Board. During the course of the proceedings, several teachers individually challenged their position on the seniority list. Further, the Board refused to allow one witness to testify out of turn. This ruling was in accord with an agreement entered into previously among the parties that no deviation in the proceedings would occur absent agreement among the parties. The Board also asked one of the witnesses for the teachers to step down after the witness had ignored several admonitions from the teachers' counsel and from the hearing officers to stop testifying about irrelevant matters.

Based on the testimony and evidence presented at the hearing, the Board on June 7, 1982, entered Findings of Fact and Conclusions of the Board. The Board found that the proposed layoffs constituted a justifiable decrease in the number of teaching positions and that the teachers chosen for layoff were properly selected pursuant to the terms of the Collective Bargaining Agreement entered into with the NEA-South Bend. The Board also found that the teachers who individually challenged their position on the seniority list were not entitled to a change in seniority. Pursuant to these findings, the Board on June 7, 1982 cancelled the contracts of the teachers who attended the hearing and also the teachers who had not attended the hearing but had received notice of cancellation.

The Collective Bargaining Agreement went into effect on August 15, 1980, and terminated on August 15, 1983, and was superseded by a 1982–84 Collective Bargaining Agreement with an identical "no-minority layoff" provision. However, the School Corporation formed a committee to study the matter of minorities and reductions in force. Such committee recommended in January 1984 the adoption of the following substitute clause which reads:

> Affirmative retention is defined as maintaining the same percentage of minority teachers in each minority classification throughout a period of reduction in force as were employed prior to such a reduction. For the purposes of this contract,

---

**2.** The number of teachers who were laid off was subsequently reduced to 146 pursuant to an agreement between the School Corporation and the NEA-South Bend. The parties entered into the agreement as part of a consent order by Special Judge, John G. Baker, in an action entitled *South Bend Community School Corporation v. National Education Association South Bend, et al.,* which was pending in St. Joseph Circuit Court and docketed as Cause No. N–7015.

minority shall be defined as members of the Black and Hispanic Races. (P. 17, Sec. 5, "Final Report of the Minority Language Committee")

The plaintiffs allege that they were laid off in violation of the equal protection and due process clauses of the Fourteenth Amendment of the Constitution of the United States, the Civil Rights Act of 1861, 42 U.S.C. § 1981, the Civil Rights Act of 1871, 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Indiana Constitution, and the Indiana Teacher Tenure Act, I.C. § 20–6.1–4–1, *et seq.* The plaintiffs further allege the Board's determination to lay them off was arbitrary and capricious.

Defendants contend that Article XXIII, § 9 was a necessary part of the School Corporation's voluntary affirmative action program and did not unreasonably favor blacks over whites. With respect to the state claims, defendants argue that the Board fully complied with the Indiana Teacher Tenure Act, thus satisfying the due process clause of the Fourteenth Amendment.

The case of *Britton, Kochanowski et al. v. South Bend Community School Corporation*, No. S 82–283, was commenced by the filing of a complaint in this court on June 11, 1982. Its companion case, *Andrews et al. v. South Bend Community School Corporation et al.*, No. S 82–485, began as a state court action filed on October 5, 1982 in the St. Joseph Circuit Court, St. Joseph County, Indiana. It was brought by forty named plaintiffs, all teachers or former teachers of the School Corporation, against the South Bend Community School Corporation and its seven-member Board of Trustees. Defendants removed the case to this court by the filing of a petition for removal on October 22, 1982. These cases were consolidated for all purposes, including discovery, preliminary motions, pretrial procedures and trial on the merits by order of this court on November 2, 1982.

Plaintiffs filed for a preliminary injunction on November 29, 1982. After a hearing on December 2, 1982, such motion was denied by order of this court on December 15, 1982. A motion for partial summary judgment was filed on December 2, 1982 against plaintiffs, H. Keller and L. Edler. On March 10, 1983, that motion was granted and those parties were dismissed from the action. The court now turns to the discussion of the merits of the case.

## II.

### A.

#### Federal Claims

The central issue in this suit is the legality of Article XXIII, § 9, the provision of a collectively bargained agreement between the NEA-South Bend and the School Corporation, which provides for "no minority layoff" in the event of a reduction in force. Although the Supreme Court of the United States has consistently held that states may implement voluntary race-conscious plans to eradicate the effects of post unconstitutional discrimination, *see e.g. Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the plaintiffs argue that Article XXIII, § 9 is an impermissible racial classification in that it neither pursues a compelling state interest nor is it a narrowly drawn means to such an end. They attack it on both federal constitutional and statutory grounds. Specifically, plaintiffs urge this court to adopt the traditional strict scrutiny test in its evaluation of Article XXIII, § 9 under the equal protection clause of the Constitution.

Additionally, plaintiffs maintain that the case of *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) is controlling in this litigation. They read *Stotts* as requiring that where an affirmative action plan abrogates vested seniority rights, it must pursue a compelling state interest, identified by direct findings of discrimination. The

plan must also pursue that compelling state interest by the most narrowly tailored means.

Defendants argue that the test to be applied in this equal protection challenge is that espoused by the plurality in *Regents of California v. Bakke, supra*, and adopted by the Court of Appeals of the Sixth Circuit in *Detroit Police Officers Association v. Young*, 608 F.2d 671 (6th Cir. 1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), and *Bratton v. City of Detroit*, 704 F.2d 878 (6th Cir.1983) and by this court in *Janowiak v. Corporate City of South Bend*, 576 F.Supp. 1461 (N.D.Ind.1983).

■■■ Before beginning the constitutional analysis, this court reiterates that while an affirmative action plan like the one in issue might pass Title VII scrutiny where adopted by a private employer, a public employer's Title VII compliance is circumscribed by the Equal Protection Clause. Hence:

> [T]he Title VII challenge ... is necessarily subsumed into [sic] that made here under the Fourteenth Amendment; what is valid under the latter will certainly pass muster under Title VII.
>
> *Janowiak*, 576 F.Supp. at 1466–67 quoting *Bratton v. City of Detroit*, 704 F.2d at 88.

Such reasoning is also applicable to challenges made under other federal statutory laws, specifically 42 U.S.C. § 1981 and 42 U.S.C. § 1983. It is clear that affirmative action plans which do not violate the equal protection clause do not violate those federal statutes. *See Valentine v. Smith*, 654 F.2d 503, 512 (8th Cir.1981); *Detroit Police Officers Association v. Young*, 608 F.2d at 692; *Janowiak v. Corporate City of South Bend*, 576 F.Supp. at 1466 n. 4; *Wygant v. Jackson Board of Education*, 546 F.Supp. 1195, 1203 (E.D.Mich.1982). Thus, this court will address only the equal protection issue.

■■■ All parties to this litigation agree that the standard to be applied in constitutional analysis under the Fourteenth Amendment is strict scrutiny. *Bakke*, 438 U.S. at 361, 362, 98 S.Ct. at 2784, 2785. The point in contention is the test to be applied with respect to this standard. The Sixth Circuit has fashioned an interpretation of the test consistent with that set forth by the plurality in *Bakke*. That court cautions that in cases of reverse discrimination, "strict scrutiny" takes on a different nuance:

> [A] case involving a claim of discrimination against members of the white majority is not a simple mirror image of a case involving claims of discrimination against minorities. One analysis is required when those for whose benefit the Constitution was amended or a statute enacted claim discrimination. A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a group formerly subjected to discrimination the case moves with the grain of the Constitution and national policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain ....
>
> *Young*, 608 F.2d at 697.

The first prong of the test espoused by the *Bakke* plurality is that an articulated purpose or plan serve an important governmental objective. *Bakke*, 438 U.S. at 361, 98 S.Ct. at 2784. The second prong of the test requires that the affirmative action program be reasonably related to the achievement of its remedial objective. *Bakke*, 438 U.S. at 373–74, 98 S.Ct. at 2790–91.

The Sixth Circuit in *Detroit Police Officers Association v. Young, supra*, added a gloss to the first prong of the *Bakke* plurality test. In *Young*, white police officers claimed that an affirmative plan adopted by the Detroit Police Department affecting promotions violated both Title VII and the equal protection clause. The plan provided that 50 percent of the police officers promoted to the rank of sergeant must be black. The district court held that the equal protection clause prohibited the adoption of an affirmative action plan absent

judicial findings of prior intentional discrimination against the blacks who benefited from its implementation. Since the City of Detroit produced no such evidence, the plan was declared unconstitutional.

The Court of Appeals reversed. Finding error in the requirement that there be an antecedent judicial determination, the court noted that a policy to that effect would preclude virtually all voluntary affirmative action. The Sixth Circuit held that the city could constitutionally adopt an affirmative action plan upon a showing that blacks had been underrepresented on its police force. The court articulated the inquiry to be made as "... whether there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access [and promotion] of minorities." 608 F.2d at 694.[3]

Plaintiffs advocate the test for strict scrutiny articulated by Justice Powell in *Bakke,* i.e. it must be shown that the State's "interest ... is compelling ... [and] the program's racial classification is necessary to promote this interest." *Bakke,* 438 U.S. at 315–16, 98 S.Ct. at 2761–62. Ancillary to this is plaintiffs' contention that the compelling state interest be identified by direct findings of discrimination. In support of such proposition, plaintiffs rely heavily on *Stotts, supra.*

In *Stotts,* a black fireman filed a class action alleging that the Memphis Fire Department was violating Title VII by making its hiring and promotion decisions on the basis of race. Thereafter, the parties entered into a consent decree which was approved by the district court. Pursuant to the decree, the City of Memphis adopted a goal of increasing the percentage of black firemen until it approximated the percentage of blacks in the Memphis area's labor force.

In May 1981 projected budget deficits required the layoff of some firemen. Pursuant to its agreement with the firefighters' union, the City conducted the layoffs on the basis of seniority. At Stotts' request, the district court enjoined the city from making the layoffs solely on the basis of seniority.

In overturning the injunction, the Supreme Court noted that individual members of a plaintiff class must demonstrate that they have been actual victims of the discriminatory practice before being awarded competitive seniority. 104 S.Ct. 2588. The Court, in essence, held that Title VII does not permit the affirmative action goals of a consent decree benefiting employees who were not "actual victims" of discrimination to be given greater protection than a bona fide seniority system in the event of unanticipated layoffs.

Having carefully reviewed the law presented by the parties, this court finds the test of reasonableness as set out by the Sixth Circuit in *Young* and, most recently, in *Bratton* to be controlling. First, the dispute over whether the first prong of the constitutional analysis should require a "compelling state interest" or a showing that some governmental interest is being served is an exercise in semantics in that the Supreme Court has already recognized that remedying the present effects of past discrimination is compelling; *Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784.

Second, the court does not read *Stotts* to require direct findings of discrimination in a voluntary affirmative action plan. The "no minority layoff clause" in the collective bargaining agreement here was formed in a different factual and procedural context than that found in *Stotts.* It was approved by the rank and file of the NEA-South Bend (including these plaintiffs) not once

---

**3.** In cases dealing with school corporations, it is proper to compare the percentage of minority faculty with the percentage of minorities in the student body rather than with the percentage of minorities in the relevant labor pool. *Wygant v. Jackson Board of Education,* 546 F.Supp. 1195 (E.D.Mich.1982). In *Wygant,* the Court found it appropriate to use such a comparison because of the vital role teachers play as role-models for their students. This is particularly true in the rise of minority teachers since "societal discrimination has often deprived minority children of other role models." *Id.* at 1201.

but twice. Neither was it a necessary part of the Consent Decree approved pro forma by this court nor was it in any way mandated by this or any other court.

There can be little doubt that the Supreme Court intended new teaching as to some *court imposed* affirmative action programs in *Stotts*. That teaching does not extend to this case. Therefore, the court cannot read into *Stotts* an interpretation of the law which the language of that opinion simply will not support.[4]

■ Turning now to an examination of the factual merits of the case, the court finds Article XXIII, § 9 to be constitutional and statutorily valid. The first inquiry which must be made is whether there is some showing of previous underrepresentation of minorities in accord with *Young* and *Bratton*. At the time Resolution 1020 was adopted, the School Corporation was aware of the severe racial imbalance in its teaching force. On June 18, 1978, Mr. Willie Green, a community activist, pointed out to the Board that although blacks made up approximately 21.37% of the School Corporation, only 9% of the 1500 teachers in the School Corporation were black.

At the meeting of October 2, 1978, Mr. William Roberts, the Acting Superintendent of Personnel, presented statistics portraying the number of black teachers and the number of black employees from 1970–1978. Based upon the most current statistics (1978–79), out of 114 administrators, only 22 were members of a minority class and out of a total of 1478 teachers, only 152 were minority class members. These particular findings were made by the School Board, a body competent to make such findings. *Bakke*, 438 U.S. at 363–64,

98 S.Ct. at 2785–86. Thus, the court finds that the historical discrimination is enough to qualify as "past discrimination" within the meaning of *Young* and *Bratton*.[5]

The next inquiry is whether Article XXIII, § 9 is "substantially related" to the objective of remedying the racial imbalance among teachers. This entails a determination of whether the teachers were unduly stigmatized and whether the program applies the use of racial classification reasonably. *Bratton*, 704 F.2d at 890.

The white teachers have not been stigmatized by Article XXIII, § 9 within the meaning of *Young* and *Bratton*. The underlying purpose of the plan was to uplift blacks rather than to exclude whites and the layoffs which did occur were not at all related to merit. Rather, testimony indicated that the layoffs were precipitated by declining enrollment and financial problems. (Inj. Tr. at p. 133). Therefore, the white teachers were not being subjected to what amounts to a constitutionally invidious stigma.

Neither have the white teachers' interests been invidiously or unnecessarily trammeled by the layoff provision. "... [A] plan designed to remedy the effects of past discrimination is not invalid merely because some individuals not in any way culpable with respect to past discriminatory acts must bear the brunt of racial preference. *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777–78; *Bratton*, 704 F.2d at 891. Article XXIII, § 9 did not result in the permanent discharge of all the white teachers originally laid off. As plaintiffs admit in their brief, all but twenty of the teachers originally laid off have been recalled. (Plain-

---

**4.** The Supreme Court in *Stotts* specifically reserved ruling on the issue presented in this case:

Finally, the Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally could have done by way of adopting an affirmative action program. Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objections.

104 S.Ct. at 2590.

**5.** At the trial of this case, the School Corporation introduced statistics showing the ratio of the number of black students to the number of black teachers. In 1966, there was one black teacher for every 61.2 black students; in 1982, one black teacher for every 51.4 black students; in 1978, one black teacher for every 40.6 black students. *See* Defendants' Ex. E–1.

tiffs' Brief at p. 21). Moreover, the teachers ratified collective bargaining agreements containing Article XXIII, § 9 not only once but twice.[6] Though certainly not indicative of constitutionality or validity of the provision, such affirmation is some indicia of the reasonableness of the clause.

Testimony by members of the School Corporation has established that Article XXIII, § 9 was designed to do nothing more than prevent the loss on hiring gains which had been achieved since the Board resolved to increase the percentage of its black teachers. (Trial Tr. at P. 37). Crucial to this discussion is the fact that student enrollment in the School Corporation has declined every year since 1966. This has been accompanied by a similar decline in the number of teachers. In a period of declining staff and student enrollment, layoff provisions are the only means of retaining any progress made in hiring procedures. Although the layoffs increased the percentage of black teachers from 13% to 13.8%, the percentage of black teachers employed by the School Corporation (13.8%) remained well below the percentage of black students (25.8%) attending the Schools of the South Bend Community School Corporation.

Further, Article XXIII, § 9 was also reasonably related to remedying racial imbalances in that it was a temporary measure. The court cannot accept plaintiff's characterization of the clause as ongoing maintenance mechanism. It is "ongoing" only as long as the agreement is in effect; any change in the collective bargaining agreement would necessarily affect future layoffs and, therefore, the status quo.

Finally, plaintiffs allege that there were other methods to maintain the gains made under Resolution 1020. Specifically, they suggested: (1) following the straight seniority system for layoffs but institute a modified recall procedure to recall blacks first, or (2) limit the minority layoffs to the percentage of blacks on the staff. However, both of the plans are race-conscious also. Assuming any or both of the above plans are more reasonable than Article XXIII, § 9, this element is not determinative of the outcome of the analysis but is simply one characteristic that must be taken into account. The fact remains that since passing Resolution 1020 and prior to the layoff, the School Corporation had increased its percentage of black teachers from 10.4% to 13%. If seniority alone had governed the layoffs, the percentage of black teachers would have decreased from 13% to 10.8%, a figure just slightly above the percentage of black teachers (10.4%) on the teaching staff just prior to the passage of Resolution 1020.

Thus, in light of all the considerations discussed above, the court concludes that Article XXIII, § 9 is substantially related to proper objectives and is, therefore, constitutional. For the same reasons Article XXIII § 9 does not violate the equal protection clause of the Indiana Constitution, as the protection afforded by that clause is coextensive with the protection afforded by its federal counterpart. *Huff v. White Motor Corp.,* 609 F.2d 286, 298 (7th Cir.1979); *Indianapolis v. Clint's Wrecker Service, Inc.,* 440 N.E.2d 737, 745 (Ind.App.1982).

### B.

### State Claims

The court turns now to the state claims pending in this cause of action.[7] Essentially, the plaintiffs' challenge: (1) the validity of the School Board Meeting of June 1 and 2, 1982; (2) the Board's decision with respect to seniority claims advanced by plain-

---

**6.** The 1980–83 Collective Bargaining Agreement was superceded by a 1983–84 Collective Bargaining Agreement with an identical "no minority layoff" provision. However, the 1983–84 Agreement did contain a memorandum of understanding that a joint committee consisting of teachers and administrators would be formed to review the current language in the contract and to make recommendations to both parties

at the bargaining table next year. *See* "Final Report of the Minority Language Committee," Plaintiffs Ex. 12.

**7.** The claim based on the Indiana Constitution is not included here since it was addressed in the discussion of the federal constitutional question.

tiffs Jan Meiss, Jeanne Reabarger, Patricia Toth and Bonita Ujdak; and, (3) the validity of the "no minority layoff" clause under the Teacher Tenure Act, I.C. § 20–6.1–4–1 *et seq.*

■ Having found no merit to the plaintiffs' federal claims, this court declines to exercise pendent jurisdiction over the remaining state claims. The Supreme Court of the United States has held that federal courts may exercise pendent jurisdiction over state laws claims where the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (2966). However, the power need not be exercised in every case in which it is found to exist. Thus, it has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. *Id.* at 726, 86 S.Ct. at 1139. Though *Gibbs* appears to require dismissal of the state claims if the federal claim, though substantial enough to confer jurisdiction, was dismissed before trial, *Id.* at 726–27, 86 S.Ct. at 1139–40, courts may, and have, dismissed pendent state claims after a trial on the merits when a federal claim has not been proven. *See Delcambre v. Delcambre*, 635 F.2d 407 (5th Cir.1981).

The crux of the state claims in this case is the impact of Article XXIII, § 9 on the plaintiffs' seniority rights under the Indiana Teacher Tenure Act. The question of whether an affirmative action plan violates the Teacher Tenure Act has not been addressed by Indiana courts. Therefore, where, as here, the proper resolution of the state law question is unclear, a federal court may properly decline to address the pendent issues. *Sanders v. Duke University*, 538 F.Supp. 1143, 1148 (M.D.N.C. 1982). Any judgment by this court on this question would be purely advisory and of no precedential value to the state courts.

Accordingly, it is the order of this court that plaintiffs take nothing by way of their complaint against the defendants, South Bend Community School Corporation and its Board of Trustees, and judgment is hereby entered in favor of the defendants and against the plaintiffs. It is further ordered that plaintiffs' state law claims be DISMISSED WITHOUT PREJUDICE. SO ORDERED.