**PARENTS FOR QUALITY EDUCATION WITH INTEGRATION, INC.; Brown, Brandy, Mylan and Demaraus by their** mother and next friend, Alisha Brown; Brownlee, Scepter by his mother and next friend, Ora Brownlee; Cook, Torrey and Tereseca by their parents and next friends, Regina and Richard Cook; Phillip Harris by his mother and next friend Diane Harris; Jason and Shawn Hutchens by their mother and next friend, Carolyn Hutchens; Gwenetta Lewis, by her mother and next friend, Patricia Lewis; McClain, Marco, Derrick, Shyra, Antonia, and Kendice by their mother and next friend, Florence McClain; Kendrick Sanders by his mother and next friend, Jacquelyn Sanders; Timothy J. and Brenittella Sneed, by their mother and next friend, Mary A. Sneed; Terrie Young by her mother and next friend, Edith L. Young; Emily Fairchild by her parents and next friends, Janice L. and David L. Fairchild; and Sachs, Claire and Daniel, by their parents and next friends, Barbara and Jeremy Sachs, and all other similarly situated, Plaintiffs,

v.

**FORT WAYNE COMMUNITY SCHOOLS CORPORATION; Dr. Bill C. Anthis, Superintendent of the Fort Wayne Community Schools; Ann K. Silletto, President of the Fort Wayne Community Schools Board of School Trustees; Stephen Corona; Richard T. Doermer; Ronald G. Kleopfer; Dr. Bernard Stuart; Dr. Jeff H. Towles, and Eugene A. Yergens, Members of the Fort Wayne Community Schools Board of School Trustees; Defendants.**

Civ. No. F 86–325.

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 24, 1990.

---

**1374**

See also 662 F.Supp. 1475.

William L. Taylor, Dianne M. Piche, Washington, D.C., Julius L. Chambers, Theodore M. Shaw, Norman J. Chachkin, New York City, Clifton E. Files, Fort Wayne, Ind., Richard B. Fields, Cox & Fields, Memphis, Tenn., for plaintiffs.

Robert S. Walters, James P. Fenton, Fort Wayne, Ind., David Michael Wallman, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

Richard J. Darko, Indianapolis, Ind., Frederick R. Tourkow, Fort Wayne, Ind., for Fort Wayne Educ. Ass'n, amicus curiae.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This Order explicates in writing the oral announcement and findings made in Fort Wayne, Indiana, on December 14, 1989, and thus complies with the mandates of Rule 52 of the Federal Rules of Civil Procedure.

The court has before it a consent decree in twenty-three pages that is marked as "Appendix A" and incorporated herein by reference. As indicated orally, on December 14, 1989, this consent decree is the result of long, arduous and difficult negotiations involving counsel for the parties to this case; other interested persons; the Honorable Gene B. Lee, United States Magistrate; and, indeed, this court. The fairness hearing indicated that, while various interest and community groups were not unanimous in their support of this consent decree, there was significant widespread support for it. This is said with the full understanding that there was lack of support for the decree from some members, a minority, of the current school board of the Fort Wayne Community Schools Corporation.

One does not have to live long in the federal judiciary at the district court level to learn that there are hard and difficult realities in the decisional process of these cases, which represent a second or third generational legacy of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It is also readily apparent in the relevant decisional law in this circuit that these kinds of class actions generate a favorable judicial attitude toward settlement. *See, e.g., Armstrong v. Board of School Directors,* 616 F.2d 305, 312 (7th Cir.1980). Several decisions of this court relating to the school desegregation of the South Bend Community Schools are in the same vein.[1]

---

1. *See Britton v. South Bend Community School Corp.,* 593 F.Supp. 1223 (N.D.Ind.1984), *aff'd* 775 F.2d 794 (7th Cir.1985), *reh'g granted, judgment vacated by* 783 F.2d 105 (7th Cir.1986), *on reh'g* 819 F.2d 766 (7th Cir.1987), *cert. denied* 484 U.S. 925, 108 S.Ct. 288, 98 L.Ed.2d 248

(1987); *Brookins v. South Bend Community School Corp.,* 95 F.R.D. 407 (N.D.Ind.1982), *aff'd* 710 F.2d 394 (7th Cir.1983), *cert. denied* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984); *United States v. South Bend Community School*

■ There are under *Armstrong* several factors to be considered in evaluating the fairness of a proposed settlement:

1. The strength of the plaintiff's case on the merits balanced against the relief offered in the settlement;

2. the defendant's ability to pay;

3. the complexity, length, and expense of further litigation;

4. the amount of opposition to the settlement;

5. whether the settlement is the product of collusion;

6. the reaction of members of the class to the settlement;

7. the opinion of competent counsel;

8. the stage of the proceedings and the amount of discovery completed.

*Armstrong,* 616 F.2d at 314.

The plaintiffs alleged in their complaint the existence of an unremedied, system-wide violation of the Fourteenth Amendment's equal protection clause, perpetrated by the defendants' maintenance of a racially dual system of schools. If these facts were to be proved at trial, there would be an adequate legal basis for the system-wide remedy requested by these plaintiffs.

The record in this case is reflected in eighteen pages of docket sheet entries. A substantial portion of the entries relates to discovery requested and provided. Obviously, this court was not in a position finally to evaluate the strength of the plaintiff's case on the merits. The parties have cited an array of court decisions regarding racially segregated public school facilities:

*Dayton Board of Education v. Brinkman,* 443 U.S. 526 [99 S.Ct. 2971, 61 L.Ed.2d 720] (1979) ("*Dayton II*"); *Columbus Board of Education v. Penick,* 443 U.S. 449 [99 S.Ct. 2941, 61 L.Ed.2d 666] (1979); *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189 [93 S.Ct. 2686, 37 L.Ed.2d 548] (1973); *Diaz v. San Jose Unified School District,* 733 F.2d 660 (9th Cir.1984), *cert. denied,* 471 U.S. 1065 [105 S.Ct. 2140, 85 L.Ed.2d 497] (1985); *Arthur v. Nyquist,* 573 F.2d 134 (2d Cir.) *cert. denied,* 439 U.S. 860

*Corp.,* 511 F.Supp. 1352 (N.D.Ind.1981), *aff'd*

[99 S.Ct. 179, 58 L.Ed.2d 169] (1978); *NAACP v. Lansing Board of Education,* 559 F.2d 1042 (6th Cir.), *cert. denied,* 434 U.S. 997 [98 S.Ct. 635, 54 L.Ed.2d 491] (1977); *Berry v. School District of the City of Benton Harbor,* 505 F.2d 238 (6th Cir.1974), 442 F.Supp. 1280 (W.D.Mich.1977); *United States v. Yonkers Board of Education,* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* [486 U.S. 1055], 108 S.Ct. [2821, 100 L.Ed.2d 922] (1988); *Armstrong v. O'Connell,* 463 F.Supp. 1295 (W.D.[E.D.]Wis.1979), 451 F.Supp. 817 (W.D.[E.D.]Wis.1978; *Reed v. Rhodes,* 422 F.Supp. 708 (N.D. Ohio 1976), 455 F.Supp. 546 (N.D. Ohio 1978) *aff'd,* 607 F.2d 714 (6th Cir.1979), *cert. denied,* 445 U.S. 1935 [935, 100 S.Ct. 1329, 63 L.Ed.2d 770] (1980); *Amos v. Board of School Directors of the City of Milwaukee,* 408 F.Supp. 765 (W.D.[E. D.]Wis.), *aff'd,* 539 F.2d 625 (7th Cir. 1976), *vacated,* 433 U.S. 672 [97 S.Ct. 2907, 53 L.Ed.2d 1044] (1977); *United States v. Board of School Commissioners of the City of Indianapolis,* 332 F.Supp. 655 (S.D.Ind.1971), *aff'd,* 474 F.2d 81 (7th Cir.), *cert. denied,* 413 U.S. 920 [93 S.Ct. 3066, 37 L.Ed.2d 1041] (1973) ... *Bell v. Board of Education, Akron Public Schools,* 683 F.2d 963 (6th Cir.1982); *Alexander v. Youngstown Board of Education,* 454 F.Supp. 985 (N.D. Ohio 1978), *aff'd,* 675 F.2d 787 (6th Cir.1982); *Higgins v. Board of Education of Grand Rapids,* 385 [395] F.Supp. 444 (W.D.Mich.1973), *aff'd,* 508 F.2d 779 (6th Cir.1974).

The court proceeds to address the various *Armstong* factors:

■ 1. Relief provided for in this settlement affects the system-wide structure of the Fort Wayne schools. The technique used is the so-called "magnet schools," which have come to be used widely in desegregation school plans and are regarded as offering advantages of parental choice and educational opportunity and improvement. There are also back-up systems pro-

692 F.2d 623 (7th Cir.1982).

vided in the event the magnet schools alone are not adequate for their expressed purpose.

Some decree provisions provide for the equitable treatment of all students, while others address interracial understanding and the needs for educational improvement of children at risk of academic failure. There is a mechanism for monitoring the progress under the settlement and provisions regarding circumstances after 1996–97 when racial balance ratios are no longer to be required. As indicated orally, not all provisions are perfect and probably do not satisfy anyone totally. However, the court finds the terms more advantageous to all concerned than further litigation. In short, the agreement strikes a happy and agreeable balance, though not a perfect one.

2. With regard to the ability to pay, this factor is not as important as class actions in the private commercial context under Rule 23 of the Federal Rules of Civil Procedure. However, there is a provision for payment, including additional and supplemental legislation relating thereto, some of which has already been enacted.

3. The court has spoken at length on the wrenching and divisive impact on a community that emanates from protracted litigation of this sort. The court knows all too well of such problems in other communities. With this settlement the court has made every reasonable effort to avoid precisely those kinds of divisive circumstances from occurring in Fort Wayne. This special kind of litigation is extremely costly to all concerned and can be, as indicated in many reported decisions, protracted as well as divisive. It is extremely important that such adverse effects be avoided in this case.

4. Comments have already been made regarding the wide array of organizations and individuals that support this settlement, taking into account the honest and forthright opposition thereto. The court orally came down strongly on the side of those who favored, over those who opposed, the settlement and, considering the general nature of this subject, the opposition seemed to this court to be very temperate.

5. There is not a shred of evidence indicating any collusion in this case. During many meetings with this court and with then-United States Magistrate Gene B. Lee, there were strong disagreements. Some disagreements were still evident in the fairness hearing held in Fort Wayne as late as December 14, 1989, thereby negating any inference of collusion.

6. While some members of the class raised questions, most members of the class, by the record, supported the settlement, with the support far outweighing any opposition. The support indicates that most of the members of the class view this as a good and fair settlement.

7. The court was fortunate to have the parties represented by extremely able and highly competent counsel on both sides. Mr. Taylor and others on behalf of the plaintiffs were seasoned and very experienced civil rights lawyers whose record in school desegregation cases is monumental. At the same time, the lawyers representing the school board brought to their task a wealth of experience in representing school corporations in a wide range of problems. For example, in the protracted administrative proceedings that preceded this case and involved the United States of America and its administrative agencies, some of the lawyers who represented the school board in that ordeal were also involved in this process.

While there were nuances in the case, even at the end, in which there were differences of opinion, the principal thrust of the opinions of the lawyers involved overwhelmingly favored the approval of this agreement.

8. As indicated above, there was a mass of discovery done in this case up to the time of the settlement. The proceedings were on the verge of trial. The court had set a definite trial date and indicated to counsel a firm resolution to go forward with the trial on that date. That was a factor in the whole of the settlement. Certainly, the discovery gave the lawyers for all the parties a clear insight into the factu-

al presentations that were to be made for all the parties.

This court finds that the settlement is fair, reasonable and adequate. It is a fair, reasonable and adequate resolution of the plaintiff's allegations against the so-called Fort Wayne School defendants, namely Fort Wayne Community Schools Corporation; Dr. Bill C. Anthis, Superintendent of the Fort Wayne Community Schools; Ann K. Silletto, President of the Fort Wayne Community Schools Board of School Trustees; Stephen Corona; Richard T. Soermer; Ronald G. Kleopfer; Dr. Bernard Stuart; Dr. Jeff H. Towles, and Eugene A. Yergens, Members of the Fort Wayne Community Schools Board of School Trustees.

Accordingly, it is hereby ordered, adjudged and decreed that the proposed settlement as embodied in the attached consent decree is adopted, and the decree will be implemented; that the action against the Fort Wayne Community Schools, members of the board and the superintendent is DISMISSED WITH PREJUDICE, and jurisdiction will be retained during the term of the consent decree regarding its implementation. Each party will bear its own costs and attorney fees.

## APPENDIX A

## CONSENT DECREE

### I.

1. Plaintiffs initiated this action on September 5, 1986 when they filed a complaint alleging that defendants maintained an unlawfully segregated school system and demanding declaratory and injunctive relief. The complaint specifically alleged that on May 17, 1954, defendants operated a racially dual public school system in Fort Wayne, Indiana. The complaint further alleged that subsequent to May 17, 1954, defendants failed to dismantle the dual system and acted or failed to act in such a manner as to maintain and to exacerbate conditions of segregation in the Fort Wayne Community Schools. The complaint sought a judgment, *inter alia:* a) declaring that defendants and their predecessors "created, maintained, and continue to perpetuate a racially dual structure of public education" in violation of federal and state law; b) enjoining defendants from future unlawful conduct; and c) requiring defendants to "develop and implement an equitable plan of desegregation which will ... remove all vestiges of prior discrimination from the Fort Wayne Community Schools."

2. This action was brought as a class action by a not-for-profit corporation, Parents for Quality Education With Integration, Inc., and by 22 named minor plaintiffs and their parents or persons standing in *loco parentis* on their own behalf and on behalf of all other children and their parents who presently attend or who will in the future attend the Fort Wayne Community Schools. The class was certified by the Court on November 15, 1988, and consists of two subclasses; one comprised of black children and their parents and the second comprised of white children and their parents.

3. Defendants are the Fort Wayne Community Schools Corporation, its Superintendent, and individual members of the Board of School Trustees ("FWCS Defendants") and the State of Indiana, the Governor, Attorney General, Superintendent of Public Instruction, and individual members of the State Board of Education ("State defendants").

4. This Court has jurisdiction over this action and over the parties, as determined by the Court's order dated June 22, 1987, granting in part and denying in part the motion of State Defendants to dismiss. Venue is properly laid in this Court.

5. The parties to this Decree have conducted extensive discovery, including numerous interrogatories and document requests.

6. The only parties to this Decree are the certified class of plaintiffs ("plaintiffs") and the FWCS defendants. The Court duly notes that plaintiffs' case against the state defendants is as yet unresolved.

7. At the direction of the Court and with the assistance of the Magistrate appointed by the Court to preside over settlement negotiations, the parties to this De-

cree have sought to reach a fair and equitable settlement of their differences and to avoid the divisiveness and cost of litigating plaintiffs' claims. On September 28, 1989, plaintiffs and FWCS Defendants jointly moved the Court for preliminary approval of the settlement agreement embodied in this Decree. By order dated October 12, 1989, the Court preliminarily approved the proposed settlement, directed the parties to give notice to the class, and set and prescribed procedures for a fairness hearing on the settlement.

8. Pursuant to the Court's order of October 12, 1989, notice to the class (Appendix A) and the full text of the proposed agreement were published in the following Fort Wayne Newspapers: The News–Sentinel (October 25, 1989), Frost Illustrated (October 25, 1989), and the Journal Gazette (October 26, 1989) (Appendix B). The published notice set forth procedures governing the filing of comments with the Court and participation by class members and the public in the fairness hearing. In addition, plaintiff PQEI mailed letters to 68 community organizations and leaders informing them of the proposed settlement, attaching a copy of the notice, and providing instructions for submission of comments to the Court. Plaintiffs and their attorneys also appeared before or spoke via telephone regarding the proposed settlement to numerous leaders and officials of civic, religious, and business organizations, including: the Fort Wayne Urban League, the Fort Wayne Branch of the National Association for Advancement of Colored People, the Metropolitan Human Relations Commis-

sion, and the Fort Wayne Chamber of Commerce.

9. On December 14, 1989, the Court convened a hearing in Fort Wayne for the purpose of determining the fairness and adequacy of the proposed settlement to the plaintiff class. Pursuant to the procedures set forth in the October 12, 1989 order, 32 class members, individual citizens and organizations submitted written comments on the fairness and adequacy of the proposed settlement. Four of the commentators elected to make oral presentations at the fairness hearing.

10. FWCS, the Board and the Superintendent have denied and continue to deny that they or their predecessors have committed any wrongdoing or that they or any of their predecessors have caused racial isolation in the Fort Wayne public schools to the extent that such isolation exists at present or has ever existed. Nothing in [these findings or in] the Decree shall constitute an admission of liability or wrongdoing on the part of FWCS, the Board, or the Superintendent, or any of their predecessors. [nor shall the Decree, any portion of the Decree or any of the facts alleged in plaintiffs' complaint be deemed evidence of any wrongdoing, cumulatively or otherwise, in these or in any other proceedings against the FWCS defendants or their successors.] [1]

11. In a joint motion filed on September 27, 1989, seeking the Court's preliminary approval of the settlement agreement, Plaintiffs and FWCS defendants agreed that, "prior to any severance of plaintiffs' claims against the State defendants from these proceedings against FWCS defen-

---

1. FWCS defendants believe the Decree should include language in the nature of the bracketed [ ] portions of this Paragraph, while plaintiffs believe this language is unnecessary and, therefore, have not agreed to its inclusion in the Decree.

FWCS' position is that there should at least be this precatory reference to the fact that all allegations and issues subsumed within the litigation, not just the oprerative language of the decree itself, have been relegated to the archives. FWCS does not want to revisit these issues in the future. That has always been a prime motivation for FWCS to settle, for, other-

wise, these issues could never be laid to rest without actually litigating them.

Plaintiffs' position is that the agreed-upon provisions of this Paragraph, and other provisions of the Decree (e.g., Section 15, providing for dismissal with prejudice), provide the future protection FWCS seeks, and that new language should not be added at this late date. Plaintiffs are unaware of any way in which the decree could be used to affect FWCS' interests adversely in any separate proceeding. Moreover, the impact of this Decree on plaintiffs in another, speculative proceeding should not be adjudged in this proceeding.

dants, FWCS defendants should confirm certain factual matters that they have helped develop through discovery to date, and that such fact stipulations will assist the Court and, unless disputed by State defendants, will save valuable trial time in any subsequently severed proceedings between plaintiffs and State defendants." The memorandum accompanying the joint motion also included a specification of the matters subject to the stipulations.

## II.

1. *Racial Balance*

FWCS will guarantee racial balance results by a date certain and within a specific range of racial balance throughout the system, as is set forth more fully in sections 6 and 7 of this Decree.

2. (a) *Racial Balance Plan*

The racial balance plan will rely primarily on voluntary methods. All methods used will be educationally sound, but, in carrying out the terms and conditions of this Decree, FWCS will exercise its own judgment and discretion as to matters such as programming, staffing and curriculum.

2. (b) *Magnet Staffing*

FWCS has an administrative procedure for the selection of the best personnel, including principals and staff, for each of its schools, including magnet schools, and will continue to employ such procedures for the magnet schools contemplated by this Decree. Such procedures will recognize the special needs that magnet schools have.

2. (c) *Transportation and Extracurricular Activities*

Students who are enrolled in schools other than those in their home attendance district will be eligible for and encouraged to participate in all school programs, including academic, athletic and extracurricular activities. Similarly, parents of such children will be encouraged to participate in parent-teacher conferences, PTA organizations, and voluntary parent programs at the schools. FWCS will take steps in accordance with the following paragraph to facilitate both parents' and children's full participation in school activities, including but not limited to the provision of extracurricular buses and other forms of transportation where needed.

Transportation (including approved extracurricular transportation and transportation for approved special parent-centered programs or events) will be provided by FWCS for all students from the Bunche, Young, Irwin, and Ward attendance areas to (i) all magnet schools and/or magnet programs contemplated by the Decree, (ii) a reasonable number of voluntary racial balance transfer schools, and (iii) all reassignment schools, all in accordance with FWCS' transportation standards and policies. A transportation allowance will also be provided by FWCS to students who transfer to voluntary racial balance transfer schools other than those contemplated by 2(c)(ii) of this paragraph.

3. *Obligatory Back–Up*

If the racial balance goals set out in Section 6 of the Decree are not met through the voluntary methods specified in sections 2 and 7 of the Decree by the school year 1991–92 FWCS will institute such other methods, which may include student reassignment, as are necessary to accomplish the goals. The methods for carrying out any needed obligatory back-up will be selected by FWCS but will not require any additional approval by the Board.

4. *Marketing of Plan*

FWCS will undertake a vigorous effort to market the magnet programs/schools to parents, students and the community. Such efforts will include steps to recruit voluntary transfers, to encourage student selections of alternatives, to encourage every parent and student to make a school choice, and to inform parents how to choose among alternatives for their children. The goal, system-wide, is for every parent to be equitably treated and to be afforded his or her first choice of school. If a student is not assigned to the parent's first choice school, FWCS personnel will contact the parent and attempt to devise and to explain other attractive options before reassigning the student to another school. Each year, FWCS will undertake to inform all students of the availability of educational

alternatives, with a concerted effort directed to students in those schools which reflect racial isolation. FWCS will establish a recruitment and counseling center, and, among other things, will publish and widely disseminate a booklet describing all programs and opportunities and the procedure for application.

5. *Magnet Schools*

In establishing and maintaining magnet schools, FWCS will retain neighborhood attendance areas for the purpose of giving priority in admission into a magnet school to children of that attendance area. Such priorities are subject, however, to the dominant concerns of affording parents choices based on interest and maintaining racial balance in the magnet schools. Any child displaced by creation of a magnet school will be given priority into any other magnet school or program. FWCS will provide aggregate openings in its magnet schools to black students at least proportionate to the number of black students in the elementary schools. FWCS will equitably apportion the number of magnet opportunities in schools that are now predominantly white, to insure that black parents have meaningful choices for their children.

FWCS' policy on magnet admission priorities as presently constituted or amended from time to time in a manner not inconsistent with the requirements of this Decree, is incorporated by reference.

No admission requirements will be imposed for entrance to magnets, other than interest and racial balance considerations. The only exception that will be permitted is for a talented and gifted program or school, provided that admission is by non-discriminatory criteria and that steps are taken to insure the attainment of racial balance goals within the standards outlined in the Decree.

6. *Racial Balance Range*

The system-wide racial balance goal is 15 percent to 45 percent black (and 55 percent to 85 percent white) but full compliance and performance will be deemed to exist so long as no school falls below the 10 percent black range and no more than three schools fall into the 45 percent to 50 percent black range.

7. (a) *Implementation Schedule*

FWCS will fully implement this Decree including if necessary the obligatory back-up provision of Section 3, by the commencement of the 1991–92 school year, as follows:

*Fall 1988:*

MAP 1. Croninger and Young converted to magnet schools; magnet programs instituted at Waynedale and Franke Parke; Memorial Park closed.

*Fall 1989:*

MAP 2. Irwin converted to magnet school, and magnet programs instituted at Price, Holland and Washington Center schools.

*Fall 1990:*

MAP 3. Bunche or Ward converted to a magnet school, and three magnet schools or programs instituted at predominantly white schools.

*Fall 1991:*

MAP 4. Remaining predominantly black school, Ward or Bunche, converted to magnet school, and additional magnet programs instituted at remaining predominantly white schools, as necessary to meet the racial balance goals specified in Section 6.

7. (b) *Duration of Decree*

From the 1991–92 school year when the plan is fully implemented through the 1996–97 school year, FWCS will continue to meet the system-wide racial balance standards described in Section 6, making any annual adjustments in student assignments needed to maintain the standards. The monitor, appointed pursuant to Section 11, will continue to perform his or her duties until the conclusion of the 1996–97 school year.

7. (c) *Duration of Obligation*

Subsequent to the 1996–97 school year, FWCS will no longer be required to maintain racial balance ratios such as those set forth in Section 6 of this Decree or to pursue the methods of racial balance set forth in Sections 3 and 7 of the Decree; provided, however, that FWCS will continue to maintain a racially integrated school system. All decisions involving school attendance areas, programs, staffing, allocations of resources,

school buildings, and the like, will be taken in accordance with the requirements of the equal protection clauses of the United States and Indiana constitutions and applicable federal and state civil rights laws.

8. (a) *Isolation Within Schools*

The parties recognize the importance of avoiding racial isolation in classrooms and other facilities within the schools. To this end, FWCS has agreed to the 15 percent to 45 percent racial balance range described in Paragraph 6 which will minimize racial isolation. In addition, FWCS will avoid procedures or practices which result in separation of students by race within school buildings for any significant portion of the school day. Racial isolation may not be justified by the use of "mental ratings."

8. (b) *Socioeconomic Isolation*

FWCS acknowledges the importance of maintaining schools with a reasonable cross-section of student abilities and achievement levels and, in administering this Decree, the methods employed by FWCS to achieve racial balance under Section 2(a) will seek to attain this goal.

9. *Inner–City School Closings*

FWCS will not close any additional schools located in inner-city neighborhoods.

10. *School Environment*

The parties recognize the need for the creation and maintenance of a school environment that facilitates positive interracial contact and that fosters respect for racial and ethnic diversity among students.

10. (a) *In–Service Training*

FWCS will implement an in-service training program ir human relations for teachers and other staff with particular attention to the needs of faculty and staff currently assigned to racially isolated schools that will be racially balanced as a result of the Decree. FWCS will consult with the appropriate teacher and employee representative organizations in developing such a program.

10. (b) *Orientation Programs*

Orientation programs and other meetings to provide parents with full information about the Decree will be conducted by FWCS. FWCS will also develop programs to facilitate contact between parents of children of different races and communities who will attend school together as a result of this Decree.

10. (c) *Curriculum Review*

FWCS will continue to review its curriculum to assure that curriculum materials are included which foster an understanding of the heritage of all racial and religious groups.

11. (a) *Monitoring*

This Decree will be monitored by a person agreed upon by FWCS and the Plaintiffs and appointed by the Court concurrently with the entry of the consent decree. If FWCS and the Plaintiffs fail to agree on a Monitor, the Monitor will be appointed by the Court. The responsibility of the Monitor will be to report at least annually to the Court and to the parties on the status of implementation of the Decree. FWCS will make available to the Monitor and to the Plaintiffs data relating to implementation of all provisions of this Decree including but not limited to data on enrollment, applicant flow, racial composition of classrooms, and discipline.

11. (b) *Community Committee*

The Monitor and FWCS will provide information to any community group or committee established to promote the purposes of this Decree and will cooperate with such group or committee.

12. *Data Access*

FWCS will provide Plaintiffs with access to data (including but not limited to enrollment and transfer data for each school) that will enable Plaintiffs to monitor compliance with the Decree.

13. *Discipline*

FWCS agrees with the importance of fair, consistent and effective student discipline policies and practices. FWCS will continue to review its policies and practices periodically to assure that they meet these standards and are non-discriminatory.

14. *Educational Improvements*

FWCS will develop and implement a program of educational improvements that will include the following components:

14. (a) FWCS will identify existing resources:

(i) that are currently devoted to preventive, remedial and supplementary education for students working below grade level or who are otherwise at risk of educational failure, and

(ii) that are currently devoted to the creation and maintenance of positive interracial relationships of the kind contemplated by (but not limited to) Sections 10(a) and 10(b).

Existing resources will be brought together in a single coordinated program, under the direction of a central office administrator. Steps will be taken to make the most effective and efficient use of existing resources. The program may also include the assignment to existing building personnel, consistent with applicable bargaining procedures, of duties and responsibilities to assist in the effective and harmonious implementation of this program, and may also include the recruitment and use of trained volunteers.

14. (b) FWCS and Plaintiffs will also cooperate with one another:

(i) to identify, determine the costs of, and prioritize additional educational improvement programs that would require funding beyond the capacity of FWCS' existing and anticipated resources; and

(ii) to identify sources of and to secure special funding commitments from organizations and institutions other than FWCS, including (but not limited to) grants, agreements to underwrite specific programs, and contributions from industry, foundations, and other sources; and

(iii) to secure enactment into law of House Bill 1131 which provides funding for magnet schools and other educational improvements in schools. Ten percent of the funds authorized by House Bill 1131 to be raised will be dedicated by FWCS to educational improvements programs. It is currently anticipated that this 10% would yield approximately $300,000 annually for such educational improve-ments. In the event that any governmental body designated as a reviewing authority under HB 1131 reduces a request made by FWCS, the funds earmarked under this subsection will be reduced a proportionate amount from the 10% of authorized funding. [*Example:* HB 1131 authorizes levy of $0.25 per $100 of assessed valuation which will yield $3 million or $300,000 for educational improvements under this subsection. FWCS requests a levy of only $0.15 of assessed valuation which would yield $1.8 million, but still yield $300,000 of the authorized amount for educational improvements under this subsection. School Property Tax Control Board reduces FWCS request from $0.15 to $0.10 (by one-third). Funds available under subsection would be $200,000, i.e. one-third reduction of full authorized amount.]; and

(iv) to secure appropriate contributions from the State defendants to the program of educational improvements; and

(v) in the establishment of a special committee to which FWCS will appoint six (6) members and Plaintiffs will appoint three (3) members. The committee will consist of two additional members, one each appointed by the Fort Wayne Corporate Council and by the Education Committee of the Greater Fort Wayne Chamber of Commerce. The purpose of the special committee will be to identify, describe, evaluate, determine costs, and to rank in order of priority, according to the availability of funding programs and services that are designed to accomplish the purposes set out in subsection (a); and

(vi) to jointly organize and recruit education, religious, and business leaders in the community to identify, seek, and obtain the special funding commitments contemplated by this subsection (b). Such funding commitments may be to underwrite specific programs or may be for specific dollar grants or contributions, and may be for a multi-year commitments. All funds contributed shall be specifically earmarked for the education-

al improvement programs contemplated by this section.

14. (c) All educational improvements developed and implemented as a result of this section will be under the administration and control of FWCS.

14. (d) FWCS will regularly make reports on the development and implementation of all such programs and will regularly evaluate the improvements brought about by, and the effectiveness of, each such program.

14. (e) The funds made available by House Bill 1131 and earmarked under subsection (b)(iii) of this section to an educational improvement program will be made available beginning in the 1989–90 school year and will continue through the 1996–97 school year. Similarly the funds to be secured from the State defendants under subsection (b)(iv) of this Section will be made available in the 1989–90 school year and continue through the 1996–97 school year.

15. *Cooperation of Parties, Resolution of Issues, Enforcement of Decree*

15. (a) With the entry of a consent decree this Action against FWCS is dismissed with prejudice. The Decree resolves all issues in this Action between FWCS and Plaintiffs relating to alleged acts and practices by FWCS, the Board and Superintendent at any time prior to the date of the Decree, as well as to any future effects of such acts/and practices.

15. (b) Successful performance of the Decree will require the joint application of the efforts of Plaintiffs and FWCS defendants. To that end:

(i) Plaintiffs will cooperate with FWCS in implementing all provisions of this Decree, including those pertaining to magnet schools in Sections 2, 5 and 7(a) of the Decree and to the affirmative marketing of the benefits of magnets as provided for in Section 4.

(ii) If any person or entity seeks in a separate action or proceeding a remedy which would be inconsistent with the relief provided in this Decree, FWCS and Plaintiffs will take any steps needed to preserve the integrity of the Decree.

(iii) To the extent that interpretation of provisions of this Decree becomes necessary, FWCS and Plaintiffs will seek to address any issues jointly and in a cooperative manner.