## In re Ivan F. BOESKY SECURITIES LITIGATION

**Richard C. GOODWIN, et al., Plaintiffs,**

v.

**Ivan F. BOESKY, et al., Defendants.**

Nos. 89 Civ. 0510 (MP), 89 Civ. 3782 (MP), 89 Civ. 3783 (MP), 89 Civ. 3786 (MP), 89 Civ. 5567 (MP), and 89 Civ. 7722 (MP).

United States District Court,
S.D. New York.

June 6, 1995.

---

Wolf Popper Ross Wolf & Jones, L.L.P., New York City (Stanley Nemser, of counsel), Berger & Montague, P.C., Philadelphia, PA. (David Berger, of counsel).

Sachnoff & Weaver, Ltd., Chicago, IL (Lowell E. Sachnoff, of counsel), for Sachnoff Group *.

Gold, Bennett & Cera, San Francisco, CA (Paul F. Bennett, of counsel).

## OPINION

MILTON POLLACK, Senior District Judge:

On the eve of trial of the so-called Pacific Lumber Class and Shareholder Trading actions, six in number, brought by former shareholders of Pacific and consolidated in the above-captioned multi-district litigation, a Settlement was reached on May 17, 1994, providing for a settlement fund of up to $52 million less reserves for taxes and adminis-

* See footnote 2 *infra* for the membership of the Sachnoff Group.

tration. Those six actions were consolidated in the above-captioned multi-district litigation (MDL 732) and certified by the Court to proceed on behalf of a plaintiff class (Class VI). The Court additionally certified a sub-class of Class VI (Settlement Subclass 2). The settlement has been duly approved by the Court and the proceeds therefrom have been lodged under the Court's control.

In addition to that settlement, two prior settlements with other settling defendants referred to as the "Drexel Settlement" with the Drexel defendants and the "Milken Settlement" with Michael Milken and certain of his associates have yielded recoveries on behalf of the former stockholders of Pacific Lumber. In addition, the Pacific Lumber stockholders will receive distributions from disgorgement funds established by the SEC in settlements with Drexel and Michael Milken. The total distribution from these settlements and the disgorgement funds is estimated at $92 million before taxes and administration costs.

The plaintiffs' attorneys in the Class VI actions have applied to the Court for an award of attorneys' fees and expenses in the Class VI suits, not to exceed 25% of the recovery from the $52 million settlement subject to applicable taxes and administration costs. The plaintiffs' attorneys have also applied to the Court for awards of attorneys' fees upon the additional recoveries of the Pacific Lumber stockholders from allocations that the Court has approved from the Drexel and Milken Settlements and the two disgorgement Funds.

The settlement obtained for Class VI and its Subclass 2 presents different fee obligations from those pertaining to the allocations obtained from the Drexel, Milken and disgorgement Funds. The history of the respective benefits obtained for the Pacific Lumber stockholders is as follows.

## I.

### The Pacific Lumber (MAXXAM) Actions

The minority stockholder actions on behalf of Pacific Lumber lasted nearly nine years and were litigated in the federal district courts in California and New York, and the state courts in Maine, Pennsylvania and California. The actions arose out of the 1985 tender offer by the MAXXAM Group, Inc., and its affiliates ("MAXXAM") for the stock of the Pacific Lumber Company ("Pacific Lumber"), and the subsequent merger of Pacific Lumber into MAXXAM.

On September 30, 1985, MAXXAM announced a hostile tender offer to acquire all shares of Pacific Lumber for $36 a share. Shortly thereafter, on October 2, 1985, MAXXAM increased its tender offer to $38.50 per share. Initially, the Board of Directors of Pacific Lumber announced its opposition to the tender offer on the grounds that the consideration proffered was inadequate. The Pacific Lumber Board engaged Salomon Brothers and the law firm of Wachtell, Lipton, Rosen & Katz to mount a defense to the tender offer. Salomon Brothers initiated a search for a "white knight" willing to engage in a friendly merger with Pacific Lumber at a price higher than had been offered by MAXXAM. However, the so-called "white knight" search proved unsuccessful and was allegedly a token effort over a very short time frame. On October 22, 1985, MAXXAM and Pacific Lumber jointly announced that their Boards of Directors had agreed to a merger pursuant to a friendly tender offer at a price of $40.00 per share.

Two separate groups of Pacific Lumber shareholders proceeded to challenge the agreement between MAXXAM and Pacific Lumber. One group consisted of the children of the Murphy family, a family which had a relationship with Pacific Lumber going back nearly 100 years and which, for a long period of time, had owned a controlling interest in Pacific Lumber. However, by about October 1985, the Murphy family's interests had been significantly diluted and, although their holdings then were still substantial, they were not controlling. The only member of the Murphy family then on the Board of Directors was Suzanne Beaver, who resigned shortly after the Board voted to merge with MAXXAM.

On October 30, 1985, the first of the Pacific Lumber stockholder actions was filed by the Murphys in the United States District Court for the Northern District of California, seek-

ing a preliminary and permanent injunction against consummation of the tender offer and merger. The plaintiffs' motion for preliminary injunction to prevent the tender offer was denied on November 1, 1985.

On November 4, 1985, a second group of Pacific Lumber shareholders led by William Fries II and John Lippitt filed a class action ("*Fries*"), for injunctive and declaratory relief against the officers and directors of Pacific Lumber and members of the MAXXAM entourage. This complaint was filed in the Superior Court of Humboldt County, California, which was the principal place of business of the lumber company. On November 4, 1985, the Superior Court held a hearing on Plaintiffs' Request in *Fries* for a Temporary Restraining Order ("TRO") against the tender offer, and this request was granted on November 5, 1985, setting the date of November 25, 1985, for a hearing of the application for a preliminary injunction.

On November 8 and 12, 1985, respectively, two panels of the California Courts acted on emergency appeals in connection with the ongoing litigation. The U.S. Court of Appeals rejected the Murphys' appeal in the federal suit from the Court's denial of a preliminary injunction and the California State Court of Appeals rejected MAXXAM's petition in State Court for a writ of mandamus to overrule the Superior Court's TRO in the *Fries* action.

Expedited discovery was initiated and many depositions were taken. On November 15, 1985, MAXXAM filed a "civil rights" complaint in the United States District Court for the Northern District of California against the judge of the State Court who had entered the TRO that had suspended consummation of the tender offer. On November 19, 1985, the Federal Court enjoined the plaintiffs in the *Fries* action from enforcing the TRO issued by the Humboldt County Superior Court and allowed MAXXAM to proceed with its tender offer for Pacific Lumber common stock at $40 a share. Applications for appellate stays of the order enjoining the stockholders from enforcing the TRO were filed in the U.S. Court of Appeals and in the State Supreme Court and were denied in each instance. The tender offer was successfully concluded in December 1985. As a result thereof, MAXXAM, through a wholly-owned subsidiary, became the owner of over 51% of the common stock of Pacific Lumber. MAXXAM immediately commenced planning for a back-end merger in late February 1986, through which it would acquire the remaining outstanding shares of Pacific Lumber.

Following a hearing in federal court in February 1986, the Court denied the Murphy plaintiffs' request for preliminary injunction against the back-end merger and as a result of this ruling, the Murphy plaintiffs' suit was dismissed with prejudice. The merger between MAXXAM and Pacific Lumber went forward as scheduled in late February 1986. Meanwhile, in *Fries,* the plaintiffs proceeded with an amended class action complaint seeking a variety of relief. In October 1987, the state court action was stayed while plaintiffs pursued their remedies under the Appraisal Statute of the State of Maine, Pacific Lumber's state of incorporation. An attempted suit filed in Maine on behalf of Pacific Lumber's Shareholder Class was subsequently dismissed by the Maine court on technical grounds relating to the adequacy of service, and the dismissal was upheld by the Maine Supreme Court.

Public revelations regarding the events surrounding the Pacific Lumber tender offer and merger led to the filing of new actions in federal court under the federal securities laws amongst others. On June 17, 1988, Fries and Lippitt filed a class action for damages in the federal court in the Central District of California, alleging violations of the federal securities laws among other alleged violations. Another class action complaint was filed in the same court on behalf of plaintiff Thompson, *et al.,* through their attorney William G. Bertain, who later associated with the law firms of Sachnoff & Weaver, Ltd., Davis Miner, Barnhill & Galland, P.C. and other law firms representing Pacific Lumber shareholder plaintiffs including the Murphys ("Bertain Group"). That class action named as additional defendants Salomon Brothers and the members of the Board of Directors of Pacific Lumber for violations of the federal securities laws.

Additional class actions for damages arising out of the Pacific Lumber takeover were filed in federal courts in 1988 on behalf of former Pacific Lumber shareholders, including a lawsuit filed on October 24, 1988, against Boyd Jefferies and Jefferies & Co. in the Central District of California, a lawsuit in the Southern District of New York, and a lawsuit in the Eastern District of Pennsylvania. Ultimately, under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation determined that the most appropriate place for all of the pending litigations was in this Court and the pending litigations were transferred here for coordinated and consolidated proceedings in June 1989, as part of MDL 732, *In re Ivan F. Boesky Securities Litigation.* Thereafter, all litigation in the Class VI cases on behalf of Pacific Lumber shareholders occurred in this forum.

The various class suits were organized in New York and a consolidated amended complaint was filed under the overall leadership of lead/liaison counsel for MDL 732. However, the plaintiffs represented by the Bertain Group determined to opt-out of the consolidated class action and to proceed on an individual basis. As a result, separate claims were asserted in the Fourth and Fifth Consolidated Amended Complaints in MDL 732 on behalf of the two groups of plaintiffs, i.e., (1) the Class plaintiffs ("Class VI Plaintiffs"), including plaintiffs Fries, Lippitt and Jacquelyn Tribolet, who were joined by William Nelson Harris in September 1990, as an additional class representative, represented by Gold & Bennett of California, the firm which was subsequently appointed by order of this Court as Class Counsel to the Class VI Plaintiffs; and (2) the individual plaintiffs, led by the Murphy family and others, represented by the Bertain Group. The Bertain Group consisted of William G. Bertain, of Eureka, California; Sachnoff & Weaver, Ltd. of Chicago, Illinois; Davis Miner, Barnhill and Galland, P.C. of Madison, Wisconsin; LaFollette & Sinykin of Madison, Wisconsin; Robinson, Curley & Clayton of Chicago, Illinois; Krasnow, Sandberg & Cohen, of Chicago, Illinois; and Pollack and Greene of New York, New York (local counsel). The individual plaintiffs represented by those attorneys comprised the owners of some 3.3 million shares

of Pacific Lumber stock, or approximately 15% of the outstanding stock of Pacific Lumber at the time of the tender offer.

Extensive discovery proceedings were undertaken by plaintiffs' attorneys until the eve of trial scheduled for May 17, 1994. Thousands of documents were produced by the parties to the litigation, as well as by third parties and government agencies, including the Securities and Exchange Commission ("SEC"), by financial institutions, and other corporations. The discovery included inspection of public filings made by the defendants over a period of years, including annual reports and filings with the SEC, and review of internal Pacific Lumber documents, and analyses of Pacific Lumber by analysts and other experts. Plaintiffs' counsel conducted interviews with past and present employees of Pacific Lumber, timber analysts, registered professional foresters, securities analysts, government officials, appraisers, and others who possessed information regarding the lumber industry and valuation of lumber companies and Pacific Lumber in particular. A massive number of documents were examined in the MDL 732 depository established in New York pursuant to Court Order. Over a nine-year period, before and after the consolidation, more than 70 individual depositions were conducted. The discovery, which began in 1985, was still ongoing in the week prior to the scheduled commencement of trial.

The impending trial resulted in accelerated procedures by counsel for both plaintiffs and defendants pursuant to deadlines established by the Court. Counsel exchanged trial briefs, reports of experts, copies of trial exhibits, requests for admissions, deposition designations and related documents, including submissions relating to liability and damages. Counsel prepared witnesses for trial, organized exhibits, prepared affidavits, trial notebooks and memoranda, and prepared pre-trial motions for the Court. With leave of the Court, plaintiffs amended the Fifth Consolidated Amended Complaint on April 22, 1994, to plead common-law counts. On May 17, 1994, the Court granted the motion of the individual plaintiffs represented by the Bertain Group to intervene as class plaintiffs

in Class VI and to revoke their previous exclusion from that class. During the two months before the scheduled trial, counsel for plaintiffs and defendants, under the Court's impetus, met repeatedly for intensive settlement negotiations. A major defense asserted by defendants was based on applicable statutes of limitation.

Prior to this stage of the proceedings, plaintiffs and defendants had also retained experts for the purpose of presenting evidence relating to the disputed facts, including, among other matters, the extent and valuation of Pacific Lumber's timber holdings, and the value of its shares. The valuation of Pacific Lumber and its timber holdings in 1985 and 1986 and the other issues in the Pacific Lumber litigations were in sharp dispute between the plaintiffs and defendants.

During the evening of May 16, 1994, the last day before the commencement of trial, a defendant party necessary to reach a global settlement with all remaining defendants agreed to the only outstanding disputed proposed term of a global settlement, and by the next day the impasse with all settling parties was resolved.

The settling parties agreed to a settlement valued at $52 million before taxes and administration expenses to be incurred. The funds were to be and were promptly deposited in Court, pursuant to a Term Sheet of the Settlement Agreement.

Pursuant to notice and a scheduled hearing, the Court found that the settlement was fair, reasonable and adequate in light of the risks involved in establishing liability, and that it was well within the range of reasonableness and that it was negotiated at arms length over a period of many months. No negative response or objection to the settlement was expressed by members of Class VI or its Subclass 2 and this supported approval by the Court of the settlement.

## II.

### The Allocated Recoveries

Plaintiffs' attorneys in the Pacific Lumber matters have applied to the Court for awards of attorneys' fees from the allocated recoveries on behalf of Pacific Lumber stockholders from the Milken and Drexel Settlements and the Milken and Drexel disgorgement funds created by the SEC in its enforcement proceedings against Drexel and Milken. These have been estimated to yield a total of $92 million (before taxes and administration costs) payable to the former Pacific Lumber stockholders other than MAXXAM. Those Funds were created by the SEC and none of the attorneys involved in the minority stockholder cases contributed to the creation of those funds.

The origins of the Drexel Securities Litigation Settlement Fund B, the Milken Schedule 8 Settlement Fund, the SEC/Drexel Civil Disgorgement Fund, and the Milken Disgorgement Fund were as follows:

### 1. The Drexel Civil Disgorgement Fund

In 1988, the SEC filed a civil enforcement action entitled *SEC v. Drexel Burnham Lambert, Inc.*, naming, among other defendants, Drexel Inc. and Michael Milken and certain of his associates at Drexel. In 1989 the Drexel defendants entered into a final judgment of permanent injunction dated June 20, 1989, under which Drexel agreed to establish a $350 million fund to compensate claims (including those of the type asserted on behalf of Pacific Lumber stockholders) against Drexel in connection with the activities of Drexel's high yield and convertible bond department during the period of January 1, 1978—January 24, 1989.

### 2. The Drexel Securities Litigation Settlement Fund

Drexel and its affiliates went into Chapter 11 in February–May 1990. In the Chapter 11 proceedings, a Securities Claimants Litigation Group was organized to negotiate between Fixed Creditors and the Drexel Debtors to resolve the claims of the Securities Litigation Claimants who had filed proofs of claim in the Chapter 11 case. In a proof of claim against Drexel, the Pacific Lumber stockholders had asserted damages of $1.2 billion.

Negotiations were conducted in the summer and fall of 1991 among the SEC, Drexel,

and Drexel's creditors (who held in excess of $25 billion in securities fraud claims, including the FDIC/RTC, which held in excess of $6 billion in claims on behalf of failed banking institutions), and other creditors of Drexel. The goal of those negotiations was to bring about a consensual plan of reorganization in the *In re Drexel, Burnham, Lambert Group, Inc.* bankruptcy case.

Securities fraud claimants found themselves stymied in prosecuting claims against Drexel because of the bankruptcy automatic stay. These claimants were also faced with potentially extensive proceedings to estimate the amount of their claims. Because of the magnitude of the securities fraud claims, the non-securities fraud creditors could not reach agreement on a reorganization plan for Drexel until completion of the bankruptcy court's proceedings to estimate the value of the securities fraud claims.

The SEC claims were one of Drexel's major liabilities. As part of the settlement of its enforcement case against Drexel, the SEC, as mentioned above, had obtained a judgment that Drexel disgorge $350 million to be used to pay the securities law claims against it. Prior to bankruptcy, Drexel had paid $200 million of that amount; the balance of $150 million was unpaid until the settlements mentioned below.

The solution to the problems faced in the bankruptcy proceedings was a global settlement of all claims against Drexel, entered into by the SEC, Drexel and Drexel's creditors.

A Securities Litigation Claims Settlement Agreement dated May 3, 1991, ("Claims Agreement") divided the Drexel estate into two parts—one for nonsecurities fraud claimants and one for securities fraud claimants. That part of the Drexel estate allocated to the non-securities fraud claimants was to be distributed in accordance with a reorganization plan to be proposed by the creditors. The balance of the Drexel estate was to be paid into a Securities Litigation Settlement Fund and the securities fraud creditors were to devise their own system for allocating that fund.

Securities claimants were divided into two subclasses, A and B. Subclass A consisted of those claimants, including the FDIC/RTC, who would agree to pool their third-party claims with those of Drexel's creditors and to unite in a joint prosecution effort in return for a share in the proceeds of those claims. Subclass B consisted of those securities claimants who did not agree to participate in the pooling arrangement. In excess of 750 separate claims were included within Subclass A; over 280 claims were included in Subclass B.

The Claims Agreement provided for the Drexel Civil Disgorgement Fund to be fully funded and the SEC to file a Plan of Distribution for the Civil Disgorgement Fund consistent with the Claims Agreement.

The amount of claims far exceeded the available money in either the Securities Litigation Settlement Fund or the Drexel Civil Disgorgement Fund. The SEC and the Securities Litigation Claimants determined that a joint allocation plan would provide the best means for evaluating claims and allocating the available funds among them. The Subclass B Plan of Allocation provided for the selection of a five-member Executive Committee to review all claims, seek consensual resolutions with claimants, and assign a value to all claims for which consensual resolutions could not be achieved.

The Executive Committee appointed by the Court oversaw the allocation process.

### 3. *The Milken Global Settlement Agreement*

The Pool Administrators and the FDIC/RTC instituted civil litigation which led to the Milken Global Settlement as set forth in a Stipulation of Settlement, dated as of March 9, 1992. Milken became obligated to pay into the Milken Settlement Fund the aggregate sum of $500 million payable in specified installments. The Other Settling Participants agreed to pay an aggregate of $300 million. In addition, insurance carriers for the Drexel directors and officers were to pay the sum of $100 million. As part of that settlement, the SEC agreed to file a plan of distribution to allocate the $400 million Milken Civil Disgorgement Fund among the set-

tling claimants. The settling claimants were divided into four groups of claims in the underlying actions; the Schedule 8 list of such claims, one of the groups, is to receive up to $250 million of the total settlement proceeds, including the contribution from the Milken Civil Disgorgement Fund. The Pacific Lumber stockholders' claims were included among those in Schedule 8. A Steering Committee was appointed to evaluate the Schedule 8 claims pursuant to Court-approved guidelines.

In excess of $10 billion in claims were asserted by Schedule 8 claimants that were evaluated by the Steering Committee. A joint plan of distribution allocating the funds from the Milken Settlement Fund and the Milken Civil Disgorgement Fund to all Schedule 8 claimants has been approved by the Court.

### 4. *The allocations to the Pacific Lumber stockholders*

The Pacific Lumber stockholder claim against Drexel represented less than 5% of the total securities fraud related claims pending against Drexel, which were in excess of $25 billion. Similarly, the claims filed against Milken and his associates, which were merged in the Milken Global Settlement, were substantially greater than the claims against Drexel. The Pacific Lumber stockholder claim thus represented much less than 5% of the total claims being asserted against the Milken settling defendants. As in Drexel, the Pacific Lumber stockholder claim contributed a fractionally small part to the bases for the total recoveries obtained by the Schedule 8 claimants and the allocations to the Pacific Lumber claims were made in proportion to the total claims to be allocated.

The Executive Committee for Subclass B determined the amount to be allocated to each claimant to the Subclass B Fund, including the Pacific Lumber stockholders. A designated representative had been assigned to represent the Pacific Lumber stockholder

claimants in proceedings before the Executive Committee. Lowell Sachnoff, Esq., of the Chicago law firm of Sachnoff & Weaver was appointed by the Court to serve as designated representative for the Pacific Lumber stockholder claim. A disinterested member of the Executive Committee was assigned to review that claim, negotiate with the designated representative for the claimants, and to recommend a value for the claim to the Executive Committee.

The valuation of the Pacific Lumber stockholder claim in Drexel Subclass B was presumed to apply equally to the Milken Schedule 8 Allocations because of the similarity of the underlying charges in the claims. Since the liability of Drexel was based in most part upon the alleged wrongdoing of Milken, it was understood that the settlement value obtained in the Drexel allocation proceeding would also apply to the Milken allocation in Schedule 8. The Schedule 8 Steering Committee, with the concurrence of the SEC representative thereon, concluded that there was no basis for revisiting the Drexel Subclass B valuation for the Pacific Lumber claim.

After the allocation proceedings, the Pacific Lumber stockholder claim against the Subclass B Fund and the Drexel Civil Disgorgement Fund will yield a recovery estimated at $46 million before taxes and administration costs; the recovery to the Pacific Lumber stockholders from the Schedule 8 Settlement Fund and the Milken Civil Disgorgement Fund has been similarly estimated at $46 million before taxes and administration costs. No private counsel played any significant role in the disgorgements which the SEC obtained from Drexel and Milken; those funds having been created solely through the efforts of the SEC. Accordingly, there is no compensation to be paid on account of the creation of those funds.[1] However, compensation is due for counsels' services in obtaining from both the settlement and disgorge-

---

1. The SEC plans of distribution for the Drexel and Milken Disgorgement Funds provided that no attorneys' fees or expenses of counsel shall be paid directly out of distributions from Civil Disgorgement Funds. Both plans recognize, however, that distributions that become part of a common fund of recoveries in class actions properly may be a part of the basis upon which counsel have the right to make applications for fees and expenses for their efforts in creating such common fund recoveries.

ment funds the distributions for the Pacific Lumber stockholders in the Subclass B allocation proceedings and the Schedule 8 allocation proceedings.

## III

### *The Fee Applications*

On March 1, 1995, a Joint Declaration of Plaintiffs' Counsel for the Award of Attorneys' Fees and Reimbursement of Expenses ("the Joint Declaration") was filed. This document bore the signatures of attorneys from the ten plaintiffs' law firms listed in the margin.[2] The Joint Declaration requested an award of $25,122,399.60 as attorneys fees and $2,060,812.87 as reimbursement of expenses. The petitioning counsel had calculated their proposed fee award in the private suits according to the percentage-of-recovery method at 25% of the recovery therein and also sought 15.65% of the amounts allocated to Pacific Lumber class members from the Drexel and Milken Settlements and Civil Disgorgement Funds. These proposed awards represented a substantial enhancement of the petitioning attorneys' overall claimed lodestar of $13,536,856.75.

■ At a hearing held on March 16, 1995, the Court found the Joint Declaration to be an unacceptable basis for awarding fees or reimbursing expenses. The Joint Declaration did not state specifically to whom the proposed fee award would be distributed or in what amount each attorney would share in the award. Nor did it provide contemporaneous time records or any other indication of what work and in what connection and to what purpose the purported services had been rendered, beyond a summary listing of the total hours worked and lodestar claimed by each firm. Moreover, the hearing made it clear that plaintiffs' attorneys had concluded an unspecified allocation of the proposed award and the proposed reimbursement of expenses.[3] The lead/liaison counsel had also reached an arrangement to share any award of fees and expenses with a group of attorneys whose identities were not disclosed either in the Joint Declaration or at the March 16 hearing.[4] While the equitable fund doctrine (also called the common fund doctrine) does permit a district court to award a lump sum fee to be divided by the attorneys themselves, the district court has the duty to review the method by which the attorneys propose to share the award to ensure that attorneys are each fairly compensated in accordance with the compensable services they have rendered. *See In re Agent Orange Product Liability Litigation,* 818 F.2d 216, 223 (2nd Cir.) ("while the practice of allowing

2. The ten law firms that signed the Joint Declaration were: Wolf Popper Ross Wolf & Jones, L.L.P.; Berger & Montague, P.C. (hereinafter, "lead/liaison counsel"); Sachnoff & Weaver, Ltd.; Law Offices of William G. Bertain; Davis, Miner, Barnhill & Galland, P.C.; LaFollette & Sinykin; Robinson, Curley & Clayton, P.C.; Krasnow, Sanberg & Cohen; Pollack & Greene (hereinafter, "Sachnoff Group"); and Gold & Bennett.

3. As described by Mr. Nemser at the hearing: What we would also propose, your Honor, with respect to the fee payments, would be that the fees going to the plaintiffs' counsel in Pacific Lumber, as I mentioned, be in four directions for payments: one to Gold & Bennett as class counsel, one to Sachnoff & Weaver as attorneys for distribution to the Bertain group of lawyers—they have agreed upon the allocation; in fact, *there has been total agreement among all of the plaintiffs' counsel that I mentioned in the Pacific Lumber group*—and that one check be payable to Wolf Popper and one to Berger & Montague.
Transcript at 20 (emphasis added).

4. These unnamed attorneys were apparently to be paid out of the proposed fee and expense award:

Basically, what Mr. Berger and I [Mr. Nemser] are doing with respect to the portion of that expense which is down for us, which is our portion of Boesky expenses attributable to the Pacific Lumber, we are allocating $25,000 each to other plaintiffs' attorneys outside of this group who have incurred expenses thus far in the MDL 732 which can be attributable to discovery work in Pacific Lumber litigation. That would be allocated among certain law firms that have given us their expense breakdown. We would request that Mr. Berger and I would work that allocation out.

Also, as part of the fee arrangements sought here, $950,000 is anticipated to be paid over to these other plaintiffs' counsel for services rendered in MDL 732 attributable to the Pacific Lumber case, and most of that, your Honor, dealt with discovery work and the massive documents that were submitted to the depository here.
Transcript at 7–8.

class counsel to distribute a general fee award in an equitable fund case among themselves pursuant to a fee sharing agreement is unexceptional, we find that any such agreement must comport essentially with those principles of fee distribution set forth in *Grinnell I* and *Grinnell II*."), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). The Joint Declaration provided none of the essential information needed for the Court to discharge its duties in this respect. The proposed reimbursement of expenses was likewise determined to be unacceptable. No documentation beyond conclusory expense affidavits was provided in the Joint Declaration. Some claimed expenses were simply incredible: both lead/liaison counsel calculated their Pacific Lumber expenses as exactly $100,000.00, the same figure as was claimed to be the expenses paid out of the Boesky Securities Litigation Fund for Pacific Lumber expenses.

The Court therefore required the submission of individualized fee and expense applications by any attorney claiming entitlement to compensation out of the Pacific Lumber recoveries. On March 31, 1995, the same ten firms that had signed the Joint Declaration then filed a document entitled Preliminary Response of Plaintiffs' Counsel to Court's Direction to Resubmit Fee Request, which made clear that "petitioning counsel hereby withdraw their request for a general reimbursement of expenses both to the other general MDL 732 plaintiffs' counsel and the MDL 732 Litigation Fund" and that "Lead Liaison counsel have advised each of these other MDL 732 counsel that if they wish to seek any fees or expenses from the Pacific Lumber settlement fund, they must do so by separate application to this Court." On April 3, 1995, fifteen law firms filed individualized applications for fees and expenses: in addition to the ten signatories of the Joint Declaration, the five firms listed in the margin,[5] hereinafter referred to as the "Other Attorneys Group," submitted applications. The Other Attorneys Group consisted of law firms whose purported services to the Pacific Lumber Class VI plaintiffs consisted almost

entirely of indexing, categorizing, and computerizing discovery materials (often by paralegals) produced in response to the requirements of the generality of cases involved in MDL 732 rather than the Pacific Lumber Class VI cases.

No total requested fee or expense figures can be extracted from these individualized applications, because some members of the Other Attorneys Group have not allocated their billable hours and expenses among the various actions comprising MDL 732, some of which may have allegedly benefitted to some degree from their organization of the total corpus of discovery materials. However, it is clear that the Court's request for individual applications has resulted in an increase in the total lodestar claimed by the fee applicants. The combined lodestar claimed by lead/liaison counsel, the Sachnoff Group, and Gold & Bennett in their individual applications ($13,-501,262.75) is nearly the same as what they claimed in the Joint Declaration ($13,536,-856.75). The slight decline is obliterated by what two members of the Other Attorneys Group—Cohen Milstein and Wolf Haldenstein—have claimed as lodestars for that portion of their work supposedly applicable to Pacific Lumber ($905,567.00 taken together).

### 1. *Standard for equitable fund fee awards in the Second Circuit*

Plaintiffs' attorneys are seeking compensation out of the recoveries on the claims of the Pacific Lumber shareholders. The basis for their request is the equitable fund doctrine. The calculation of the fees to be awarded in an equitable fund case must be made in accordance with the Second Circuit's decision in *City of Detroit v. Grinnell Corporation* ("*Grinnell I*"), 495 F.2d 448 (2d Cir. 1974), which mandates the use of the so-called lodestar method. Under this method, the number of attorney hours expended is multiplied by the prevailing rate for the services provided; that furnishes the benchmark, or "lodestar," for determining the compensation that should be awarded to an attor-

---

5. The fives firms are: Pomerantz Haudek Block & Grossman; Cohen Milstein Hausfeld & Toll; Hamburg Rubin Mullin Maxwell & Lupin; Wolf Haldenstein Adler Freeman & Herz, LLP; and Levin Fishbein Sedran & Berman.

ney claiming entitlement to a fee award for benefitting an equitable fund.

In a memorandum accompanying the Joint Declaration, plaintiffs' counsel have asked the Court to depart from the lodestar method in favor of the so-called percentage-of-recovery method, which calculates the fee award as a percentage of the recovery obtained for the common fund. This request amounts to a suggestion that the Court should return to prior judicial practice in equitable fund cases. Prior to the 1970's, courts made awards in such cases on a "percentage" basis, i.e., a reasonable percentage of the equitable fund recovery was awarded to counsel, the amount of which was left to the courts sound discretion based upon the circumstances of the individual case. *See Court Awarded Attorney Fees: Report of the Third Circuit Task Force, Oct. 8, 1985,* 108 F.R.D. 237, 242 (1985) (Arthur R. Miller, Reporter) ("Task Force Report"). To deal with the burgeoning recoveries running into the multi-millions of dollars, in the early 1970's the "lodestar" approach gained prominence. The application of the percentage-of-recovery basis to the mega recoveries did more than raise eyebrows; another method of evaluating counsel's services more consistent with market rates for legal services was needed, and the lodestar approach was substituted in this and many other circuits.

In recent years, the "lodestar" approach has come under fire, both because of its contrarian incentives to counsel and its administrative complexities. It may be referred to as the rise and fall of the billable hour. The Third Circuit Task Force and numerous other courts found the lodestar approach wanting in their judgment because, among other things, it was thought to discourage early settlement, to encourage unjustified work on the part of attorneys, and imposed a substantial burden on the courts to spend valuable time on review of fee applications, many times resulting in approximately the same fee as would be awarded on the traditional percentage basis. *See, e.g.,* Task Force Report at 246–49; *In re Union Carbide,* 724 F.Supp. 160, 165 (S.D.N.Y.1989) ("it may well be that the entire matter of fixing legal fees is about to come full circle.");

*In re Activision Securities Litigation,* 723 F.Supp. 1373, 1375 (N.D.Cal.1989) (noting that application of the lodestar method often yields same result as would percentage-of-recovery method). Accordingly, some federal courts, including some of the district judges in this circuit, began a return to a percentage approach, based upon the size of the recovery obtained for the class, extolling both the economically sensible underpinnings of such an approach and its ease of application.

This Court may not depart from the use of the lodestar method and analysis as required by the Second Circuit Court of Appeals in *Grinnell I.* On the last occasion on which the Second Circuit reviewed an award of fees under the lodestar method, it reiterated that the method still applied to equitable fund cases. *See In re Agent Orange Product Liability Litigation,* 818 F.2d 226, 234 n. 2 (2nd Cir.1987) (noting that "the lodestar formula applies to both types of cases," equitable fund cases and statutory fee cases).

*Grinnell* requires this Court to follow a three-step process in order to calculate the compensation to which plaintiffs' counsel are entitled. First, the district court must quantify "the attorney's services in terms of the time he has expended on the case." *Grinnell,* 495 F.2d at 470. Second, the district court must value these hours. As a preliminary matter, the type of work performed during these hours and the identity of the attorney performing the work must be ascertained. *See id.* at 471. Next, the district court must "multiply the number of hours that each lawyer worked on the case by the hourly amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation." *Id.* The resulting number is the attorney's lodestar. The Second Circuit has emphasized that "an attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone." *City of Detroit v. Grinnell Corp.* ("*Grinnell II*"), 560 F.2d 1093, 1099 (2nd Cir.1977).

The final step is the consideration whether an enhancement of the lodestar is warranted. The evaluation is left in the

broad discretion of the district court to be appropriately exercised to adjust the lodestar to take account of such factors as: (i) the contingent nature of the expected compensation for services rendered; (ii) the consequent risk of non-payment viewed as of the time of filing the suit; (iii) the quality of representation; and (iv) the results achieved. *See In re Ames Department Stores, Inc. Debenture Litigation,* 835 F.Supp. 147, 150 (S.D.N.Y.1993) (Pollack, J.).

### 2. *No award is due to the "Other Attorneys Group."*

■ The members of the Other Attorneys Group are not entitled to an award of fees or expenses from the recoveries in this case and their applications are rejected, largely because they did not represent any plaintiff in the Pacific Lumber cases. The Court approved a Notice of Settlement of *The Pacific Lumber Company* Class and Shareholder Tradition Actions ("the Notice") as proposed by plaintiffs' counsel. A section of the Notice entitled "Attorneys Fees and Expenses" informed class members that

> The *Plaintiffs' attorneys in the Class VI Actions* will apply to the Court for an award of attorneys' fees not to exceed 25% of the recovery pursuant to Settlement and for reimbursement of their out-of-pocket expenses, including expert witness fees. The Plaintiffs' attorneys will also apply to the Court for awards of attorneys' fees upon the respective recoveries on behalf of Class VI and settlement Subclass 2 pursuant to the Boesky, Milken, and Drexel Settlements.

(emphasis added). The approval of the settlement proceeded on the assumption that only the attorneys representing plaintiffs in the Class VI actions would claim entitlement to a share of the recoveries, and the class members acquiesced in the proposed settlement and awarding of attorneys fees against this background. The absence of the Other Attorneys Group from the Joint Declaration is entirely consistent with this assumption. Were the Court now to award fees to the Other Attorneys Group, the Pacific Lumber recoveries would be taxed to a degree not contemplated by the class members who acquiesced in the settlement by attorneys whose identities were not revealed to the class in time for objections to be aired. The Second Circuit has stressed that in awarding fees from an equitable fund "the district court was to act 'as a fiduciary who must serve as a guardian of the rights of absent class members.'" *Grinnell II,* 560 F.2d 1093, 1099 (2nd Cir.1977) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)). Under these circumstances, the Other Attorneys Group is not entitled to any award of fees or expenses.

■ Even if these firms were entitled to make a claim directly against the recoveries for the Pacific Lumber shareholders, they would not be entitled to any award, because they are unable to satisfy their burden of establishing how many hours benefitted Pacific Lumber shareholder claims. "[T]he burden of justifying a fee claim falls on the applicant, and the uncertainties arising from inexplicitness must, in fairness to the class members, be resolved against the lawyers who are sharing in the fund." *See Desimone v. Industrial Bio–Test Laboratories, Inc.,* 83 F.R.D. 615, 622 (S.D.N.Y.1979). Four of the five firms in the Other Attorneys Group have conceded that it is impossible for them to justify the award of any particular amount of fees and expenses. *See* Sedran Affidavit at ¶ 2 ("it is not possible for this firm to parse out those services that reflect work that related to the Pacific Lumber securities case only."); Rubin Affidavit at ¶ 2 ("it is not possible for this firm to parse out those services that reflect work that related to the Pacific Lumber securities only"); Mezzetti Affidavit at ¶ 7 ("it is impossible for my firm to designate discrete tasks that we performed solely for the Pacific Lumber Litigations or their classes."); Grossman Affidavit at ¶ 6 ("The discovery services rendered by my firm [Pomerantz Haudek] were not and could not be segregated by specific stock, transactions or defendants."). The affiant speaking on behalf of the remaining firm has no personal knowledge about the extent to which his firm's services benefitted the Pacific Lumber shareholders. *See* Krasner Affidavit at ¶ 2 ("Since most of my firm's [Wolf

Haldenstein] time charges are not specifically labeled Pacific Lumber we determined after discussions with lead counsel to allocate 40% of our general time (almost entirely paralegal) to Pacific Lumber *since we have been told that more work was done in the Pacific Lumber matter than any other.*") (emphasis added).

### 3. *The claimed expenses are rejected for inadequate documentation.*

 "Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefited the class." *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1296, 1314 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 226 (2nd Cir.1987). Plaintiffs' counsel have not submitted documentation adequate to establish that their claimed expenses are reimbursable. The sources of the inadequacy varied from application to application, but in all cases, the necessity of the expenses claimed was not apparent from the mere listing of the type of expense incurred and the date on which it was incurred. This uninformative presentation of expense information, without any narrative account to explain why the expenses were being incurred—makes it impossible for the Court to determine which, if any, of these claimed expenses were necessary to obtain the Pacific Lumber recoveries. The applications were deficient in other ways as well. One application simply failed to provide any description of what its claimed expenses were, to whom they were paid, or when they were paid. Another application's haphazard omission of dates on which certain expenditures were made calls into question its general accuracy. The fees charged by various experts and consultants to plaintiffs' counsel are not out-of-pocket expenses, since these experts have not yet been paid the amounts that they claim are owed to them, and hence are not reimbursable as expenses. *See, e.g.,* Bridgeforth Affidavit at ¶ 2(m) (referring to expert fees as "to be paid"); Bertain Affidavit Ex. D at 1 (referring to "unpaid professional fees"). In other instances, the affidavits failed to establish the reasonableness of the expenses claimed, because the Court has no basis by which to evaluate the magnitude of the sums expended. This was especially the case for photocopying expenses, for which, in nearly all instances, no per-page cost could be computed from the information provided. Several applications claimed thousands of dollars in reimbursement for contributions to discovery costs in MDL 732; however, as discussed above in connection with the Other Attorneys Group, what fraction of MDL 732 discovery costs benefitted the Pacific Lumber class and claimants cannot be determined.

The applications submitted by lead/liaison counsel suffered from deficiencies peculiar to their involvement in several MDL 732 matters other than the Pacific Lumber cases. That lead/liaison counsel's involvement in other MDL 732 cases may have compromised the accuracy of their record keeping is demonstrated by the time records of Berger & Montague, P.C., for October 1994, wherein appear several references to Seema Boesky, a defendant in MDL 732 who has no direct involvement with the Pacific Lumber cases. Lead/liaison counsel's methods for tracking their expenses give no assurance that similar intermixing of Pacific Lumber and non-Pacific Lumber expenses has not also occurred. In the Joint Declaration, lead/liaison counsel both provided precise figures for their overall MDL 732 expenses but resorted to undisclosed "calculations" in order to determine what portion of their overall expenses were applicable to the Pacific Lumber claims. The individual applications thereafter submitted do not disclose what these calculations were, nor do they reveal any acceptable basis for segregating Pacific Lumber expenses from non-Pacific Lumber MDL 732 expenses. The affidavit supplied by Berger & Montague's Controller indicates that the firm used the same internal case control number—the code which identifies on behalf of which matter a particular disbursement was expended—for all of the MDL 732 cases with which it was involved. *See* Kerns Affidavit at ¶ 4. It is therefore highly improbable that Berger & Montague is able accurately to identify, years after the fact, which expenses should be charged to the Pacific Lumber

recoveries. The affidavit supplied by Wolf Popper completely fails to explain how that firm records its expenses. In light of Wolf Popper's resort to "calculations" as the basis for its original expense request in the Joint Declaration and in the absence of any contrary indication, the Court infers that Wolf Popper's records likewise do not allow it accurately to identify on which matter its various MDL 732 disbursements were expended.

The balance of the expenses and disbursements presented for an allowance to counsel in addition to fees have not been substantiated with appropriate documentation. Rather than order an expensive accounting to unravel the claimed conclusory statements of expenses incurred or paid by counsel, the Court from a detailed knowledge of the scope and extent of the professional services supplied and its experience level in litigations of this kind and of the costs and expenses necessarily incurred and laid out by counsel, will estimate and include the reimbursable items of expense as part of an overall combined allowance which will include the entire level of fees and expenses due to counsel. The fair and reasonable compensation together with their expenses and disbursements incurred will be fixed and allowed for all services rendered heretofore for the benefit of Pacific Lumber stockholders and those necessarily required hereafter from counsel for the oversight of the administration of the recoveries and distributions thereof and the final closing of the matters involved.

Suffice it to say, petitioning counsel have informed the Court that they agree that the Drexel and Milken Settlement Funds are not further obligated to counsel for fees in amassing those funds, which were applicable to Pacific Lumber shareholders and distributable to them from the two Settlements and Civil Disgorgement Funds, Drexel and Milken.

### 4. *Reserves for tax and administration expenses*

The following amounts will be set aside out of the recoveries as reserves against anticipated tax and administration expenses:

| | |
|---|---|
| Private suits | $350,000.00 |
| Drexel Subclass B and Civil Disgorgement Funds | $300,000.00 |
| Milken Schedule 8 and Civil Disgorgement Funds | $250,000.00 |
| TOTAL RESERVES | $900,000.00 |

Unused portions of these reserves will be distributable to counsel as additions to their allowances on appropriate allocations to be made by the Court except that lead/liaison counsel shall share only in any residue of tax and administration expense reserves attributable to the private suits.

### 5. *Allowances to plaintiffs' attorneys*

■ In determining the proper fee award in accordance with the standards of *Grinnell,* the Court has considered the attorney hours reasonably to have been expended herein, the appropriate hourly rates for the attorneys and others who contributed their services, and the propriety of an enhancement of the resulting lodestar. The hours claimed by petitioning counsel are inflated and include unnecessary work duplicative of the efforts of other petitioning counsel. Realistic lodestars for petitioning counsel are therefore less than those proposed. However, the quality of services rendered to the stockholders, the substantial risk of nonpayment inherent in their representation, the results achieved, and the Court's decision to deny reimbursement of the total amount of claimed expenses, justify compensation beyond the realistic lodestar amount.[6]

Accordingly, after mature consideration of each and every application for compensation

---

6. The propriety of enhancements of lodestars has been questioned. *See In re Bolar Pharmaceutical Co. Inc. Securities Litigation,* 800 F.Supp. 1091, 1096, n. 7 (E.D.N.Y.1992) (extending the holding of *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), a statutory fee case, to equitable fund cases); *but cf. In re Terra–Drill Partnerships Securities Litigation,* 733 F.Supp. 1127, 1130 n. 2 (S.D.Tex.1990) (Pollack, J.) (noting that the policy reasons for denying enhancements in statutory fee cases do not apply in equitable fund cases).

for services and upon the exercise of informed scrutiny and discretion, the Court has determined that the appropriate allowances, based on realistic lodestars enhanced to account for the aforementioned factors, including expenses connected with the services involved, are:

Gold & Bennett
| | |
|---|---:|
| for shareholder actions: | $4,000,000 |
| for Drexel/Milken allocations: | $1,650,000 |
| Total allowance: | $5,650,000 |

Sachnoff Group
| | |
|---|---:|
| for shareholder actions: | $6,000,000 |
| for Drexel/Milken allocations: | $2,500,000 |
| Total allowance: | $8,500,000 |

Lead/Liaison Counsel jointly [7]
| | |
|---|---:|
| for shareholder actions: | $2,000,000 |
| for Drexel/Milken allocations: | $0 |
| Total allowance: | $2,000,000 |

The Court is satisfied that the intended allocations of these allowances comport with and will satisfy the principles of fee distribution set forth in this Circuit's *Grinnell* decisions.

The Court has tested the reasonableness of these allowances in two ways. First, the Court has considered the range of awards that would be permissible under the percentage-of-recovery method. Second, with the exception of the award to lead/liaison counsel, which reflects a measure of duplication in their services, the allowances exceed the unenhanced lodestars claimed by petitioning counsel in their fee applications. The Court is satisfied that allowances as listed above provide appropriate and adequate compensation at fair market rates for the services rendered and expenses reasonably incurred and properly reimbursable in matters of the kind herein involved.

An appropriate order shall be submitted promptly by lead/liaison counsel in accordance with the foregoing, the awards to be payable upon affirmative acceptance thereof by counsel to and for whom the Awards have been made and upon the finality of this order; payment to be made in accordance with

footnote 1 *supra* out of the recoveries in the Class VI suits.

So Ordered.

---

**7.** The significant contributions of lead/liaison counsel together were the certification of Class VI, the drafting of the Fifth Consolidated Amended Complaint, the ultimate preparation for trial, and the negotiation and administration of the settlement.